**Inter-Insurance Exchange of the Chicago Motor Club and Robert Spaeth, Plaintiffs-Appellants, v. The Travelers Indemnity Company, a Corporation, and L. Roy Brainerd, Defendants-Appellees.**

### Gen. No. 49,553.

First District, Third Division.

March 11, 1965.

Rehearing denied April 15, 1965.

Donald L. Thompson, of Chicago, for appellants.

Kirkland, Ellis, Hodson, Chaffetz & Masters, of Chicago (David Jacker, William H. Symmes and John M. O'Connor, Jr., of counsel), for appellees.

MR. PRESIDING JUSTICE DEMPSEY delivered the opinion of the court.

This is a declaratory judgment action involving the application of the "omnibus clause" of an automobile liability insurance policy.

The plaintiff, Inter-Insurance Exchange of the Chicago Motor Club, brought the action against the defendant, the Travelers Indemnity Company, and asked for a declaration of the rights and obligations of the respective companies under a policy issued by Travelers to its codefendant L. Roy Brainerd and covering a Plymouth automobile owned by him. The omnibus clause of the policy insured any other person while operating the Plymouth provided the actual use of the automobile was by the named insured or with his permission.

On December 24, 1956, the Plymouth was involved in a collision with another auto. At the time of the accident the Plymouth was being driven by a 16-year-old youth named Robert Spaeth. He was accompanied by Max Brainerd, the 17-year-old brother of Roy Brainerd, the named insured. Two lawsuits arising from this occurrence were filed against Spaeth and Roy Brainerd.

On the date of the occurrence the mother of Robert Spaeth owned an auto which was insured by Inter-Insurance. The Inter-Insurance policy provided that relatives of Mrs. Spaeth who lived in her household were covered by the policy while driving other automobiles. A proviso limited this coverage to "excess insurance over any other valid and collectible insurance available to the insured . . . or relative . . . under a policy applicable with respect to said automobile or otherwise." Inter-Insurance claimed that its only coverage of Robert Spaeth was excess insurance

and that he was primarily covered as an additional insured under the omnibus clause of Travelers' policy. Travelers denied that its policy covered Spaeth because it claimed that he drove the Plymouth without Roy Brainerd's permission. The declaratory judgment action ensued and the trial judge, without making special findings of fact or law, found the issues for Travelers. The principal issue in the trial court, as it is in this court, was whether Spaeth's use of the Plymouth was with the permission of Roy Brainerd.

The uncontroverted facts are few. Roy Brainerd operated a gasoline service station. He held another job as a mechanic and when he worked at this other job his younger brother Max was in charge of the station. The Plymouth was used at the station for service calls but Max also drove it to and from work and occasionally for social purposes. On the afternoon of December 24th Max was alone at the station. During the afternoon he drank a considerable amount of whiskey and became sick and intoxicated. Robert Spaeth, who lived two blocks away, came to the station about 5:30 p. m. and found Max in this condition. A short time later Roy Brainerd arrived. Roy was angry with his brother. He asked Spaeth to get some coffee for Max and gave him money and the keys to his personal car for this purpose. After Spaeth returned in Roy's car with the coffee he walked Max outside in the cold air in order to sober him up. Spaeth and Max then got into the Plymouth which was parked at the station. Spaeth drove the car away from the station with Max as a passenger. It was dark and the streets were icy and the accident occurred moments later.

The remaining evidence is in conflict. Roy Brainerd testified that the Plymouth was not to be used by Max unless he himself knew about it and that Max could use the car at night for social purposes only if

20

he was given permission. He added that he never objected to Max using the car "on a date or anything like that." He said that on the night in question he did not hear any conversation between Max and Spaeth and that he did not see Max enter the Plymouth. He said he had been waiting on customers and when he saw the car move toward the street he ran outside, went up to the side of the car, pounded on it and shouted for Spaeth to stop, but that Spaeth just looked at him and sped off. Brainerd said that before Spaeth started the car he had no conversation with him and had no idea where he was going. He then returned to his customers and continued to wait on them until he heard about the accident.

In an evidence deposition read at the trial Spaeth said he had seen Max drive the Plymouth on several occasions both at and away from the station, that he understood the car belonged to Max, that he had accompanied Max on service calls, had driven the car himself a few times and had never felt that he had to ask Roy's permission to use it. He testified that he had no conversation with Roy about the Plymouth before he drove it away from the station. He said that Max wanted to go for a ride, that the keys were in the car, and that after entering it he rolled down the windows on both sides and stopped for oncoming traffic before pulling out into the street. He said that Roy, who had been waiting on customers, was talking on the telephone inside the station and did not come out to the car, or tell him not to use it or did not motion for him not to do so. He said that subsequent to the collision he saw Roy who "told him off" but that Roy was angry with him not for taking the car but for having had an accident with it.

Max Brainerd testified that he lived with Roy, drove the Plymouth to and from work, had general permission to use it as far as the service station was con-

21

cerned and that he used it a couple of times to go out on dates. He said that after .he became sick Spaeth walked him around the station and helped him into the Plymouth. He said he did not know where Roy was at the time, did not talk to him and did not see him after he got into the car. He said he did not recall the car being in motion, that he "passed out" and the next thing he remembered was waking up in the hospital. His version of what took place in the car was contradicted by Spaeth's deposition. Spaeth said that Max called his attention to the headlights not being on and continued to talk to him during the mile-long ride.

From this evidence it must be concluded that Roy Brainerd did not give Spaeth permission to drive the Plymouth and that he did not expressly authorize his brother to grant permission to Spaeth or to others. The residual questions left unanswered are whether Max had implied authority to grant permission to others and, if so, whether this permission was given to Spaeth, and finally, if it was, whether such permission was revoked before Spaeth drove the car away.

Courts have had frequent occasion to determine when and under what circumstances an automobile may be considered to have been used with the permission of the named insured. A body of case law has developed from factual situations where the named insured permits a second person to use his automobile and this person in turn permits a third person to drive the auto. In the recent case of Hays v. Country Mut. Ins. Co., 28 Ill2d 601, 192 NE2d 855, an analogous situation was before the court. The named insured permitted his 16-year-old daughter to use his car for the evening. Permission was not given to his 15-year-old son who accompanied his sister on her trip to town. During the evening the son, in the absence of his sister, told teenage friends they could

use the car. Later, his friends took it from its parking place—it required no key—and after driving it for some time had an accident. Neither of the named insured's children were passengers in the car at the time of the accident. The court held that the limited permission granted to the daughter could not be construed to imply permission for the loan of the car to others and that there was no coverage under the omnibus clause. The court stated that the requirement of permission should not be read out of the insurance contract and refused to accept the theory that the insured's permission to one user inherently carries with it, without more, a delegation of authority to the permittee to grant permission to a third person to use the vehicle.

On the other hand, the court in Hays cited with approval several cases which recognized factual circumstances where it would be implied that the third person was operating the insured's automobile within the scope of the permission granted to the original permittee:

> "Of course the named insured may by express authorization delegate to his permittee the power to grant permission to others, and circumstances surrounding the original permission may support an implication of such an authorization. Thus where the permittee is in every practical sense the owner of the car, and the named insured holds title for convenience, the general custody and control of the permittee is usually held to empower him to grant permission to others within the scope of an omnibus clause, at least in the absence of express prohibition. (See e. g., Hinckley v. National Surety Co., 99 NH 373, 111 A2d 827 (1955); Firemen's Fund Indemnity Co. v. Freeport Insurance Co., 30 Ill App2d 69; cf. Nor-

23

ris v. Pacific Indemnity Co., 39 Cal2d 420, 247 P2d 1 (1952).) If the original permittee retains control of the car, but turns over its physical operation to a third person while remaining a passenger, an implied permission has been found in the continued use and control of the original permittee. (See Standard Accident Insurance Co. v. New Amsterdam Casualty Co., 249 F2d 847 (7th cir 1957); Fireman's Fund Indemnity Co. v. Freeport Insurance Co., 30 Ill App2d 69.) Even where the original permittee is not a passenger, an inference of permission has been sustained where the third person is engaged on some errand or activity for the benefit, advantage, or purposes of the original permittee. (See Aetna Life Insurance Co. v. Chandler, 89 NH 95, 193 Atl 233 (1937).) A course of conduct, establishing that the original permittee was allowing third persons to drive with the knowledge of the named insured and without his objection, may also support a finding of implied permission. See, e. g. Odden v. Union Indemnity Co., 156 Wash 10, 286 Pac 59 (1930); Shoup v. Clemans, (Ohio App), 31 NE2d 103 (1939); cf. Goff v. New Amsterdam Casualty Co., 318 Ill App 586." 28 Ill2d at 608, 609, 192 NE 2d at 859, 860.

Certain of these factual circumstances are present in the case before us. Max Brainerd, the original permittee, had general control of the Plymouth at least while his brother Roy was away from the service station and there was no express prohibition against his letting someone else drive it. More significant is the fact that he was a passenger in the car at the time Spaeth drove it. This factor itself is an important criterion in determining if there is implied permission in that the use of the car, as distinguished

24

from its operation, remained under the control of the original permittee. Indemnity Ins. Co. v. Metropolitan Cas. Ins. Co. of New York, 33 NJ 507, 166 A2d 355 (1960); 160 ALR 1195, 1213. Further, the mission of Spaeth at the time of the accident seemingly was for the benefit and advantage of the original permittee. According to the weight of authority in this area, these factors would normally be sufficient to justify the conclusion that the Plymouth was being used within the scope of the permission granted by the named insured and would suffice to bring Spaeth within the coverage of the policy as an additional insured.

These factors, however, must yield to another consideration: the resolution of the factual issues in favor of the defendants. Although the trial judge made no special finding of fact and was not required to do so (Ill Rev Stats 1963, c 110, § 64(2)) there seems little doubt that the judge accepted Roy Brainerd's version of what took place and accordingly found that Roy's action effectively revoked whatever authority had been granted Max and through Max to Spaeth. The evidence on the revocation issue was divided between the testimony of Roy Brainerd that he ran to the car and pounded on it and shouted for Spaeth to stop, and the denial of Spaeth that Roy made any attempt to restrain the use of the car. Max Brainerd's testimony was vague and of little value to either his brother or Spaeth. Some inferences that can be drawn from the surrounding circumstances tend to support Roy's testimony: his 17-year-old brother was ill and in a semi-intoxicated condition and he may not have wanted him to leave; he also may have wanted the service car available at the station—especially so considering the night and the weather. Conversely, the fact that Roy must have considered Spaeth

25

capable of driving since he had asked him to drive his own car on the icy streets earlier that evening tends to discredit his testimony.

The weight to be given in this court to the trial court's factual finding poses an interesting problem. What rule is to be applied on review when the evidence in a nonjury trial is equally divided between oral and written testimony?

██ ██ We know of no Illinois case precisely in point. In general the rationale of our courts in this area is that when the testimony in the trial court is oral the trial judge's determination of the facts should not be disturbed because the judge personally heard and appraised the witnesses and was in a superior position to weigh the facts; the corollary rationale is that when the trial judge neither hears nor observes the witnesses he is in no better position to pass on the evidence than a court of review which therefore is free to make an independent determination of the evidence. Thus where all the witnesses have testified before the court and the evidence is contradictory, the rule is that the trial court's finding of fact is to be accorded the same weight as the verdict of a jury and will not be set aside unless it is manifestly against the weight of the evidence. Hood v. Brinson, 30 Ill App2d 498, 175 NE2d 300. The same rule has been applied in a case in which there was both oral and written evidence but where the oral testimony predominated in both quantity and quality. Lubin v. Goldblatt Bros., Inc., 37 Ill App2d 437, 186 NE2d 64. However, where the evidence before the trial court consists of depositions, or transcripts or is documentary, the rule is that an appellate court is not bound by the trial court's findings but may make an original examination of the evidence and an independent decision on the facts. In Re Deskovic's Estate, 21 Ill App2d 209, 157 NE2d 769; Baker v. Rockabrand,

26

118 Ill 365, 8 NE 456. The latter rule also has been applied in a case where some of the testimony was oral but the greater portion of it was by deposition. Farrin v. Fox, 47 Ill App 273. In jurisdictions other than Illinois the general rule seems to be that where there is any oral evidence the findings of the trial court will not be disturbed unless contrary to the manifest weight of the evidence. In 5A CJS, Appeal and Error, sec 1660, p 577, the majority view is said to be:

> "When in addition to the documentary or written evidence there is also some oral evidence which enters into the trial court's consideration or affords a partial basis for the findings, it is usually held that the findings are to be accorded their usual binding effect. . . ."

While we do not think the manifest weight of the evidence rule is appropriate where the credible evidence on a material issue is equally divided between oral and written testimony, we do believe something more is required to set aside the findings of the trial court than the mere fact that a court of review might have reached a different conclusion. In an evidentiary situation such as we have in the present case the trial court's resolution of a factual dispute should not be disturbed if there is substantial evidence to support it. The facts here are sharply controverted and the evidence is closely balanced but the evidence is sufficient to sustain the conclusion reached by the court. In nonjury trials the weighing of conflicting evidence is the especial function of the court. The trial court had the advantage of seeing Roy Brainerd and the opportunity to estimate his credibility. His testimony was believed. We cannot say it should not have been. We will not set aside the finding, implicit in the trial court's decision, that in doing what

he did Roy Brainerd revoked whatever permission he had previously extended for the use and operation of his Plymouth automobile.

We therefore must also reject the further argument of the plaintiff Inter-Insurance that since Roy Brainerd never expressly prohibited Max from using the Plymouth and since Spaeth's permission emanated from Max, only Max himself could revoke it. This argument is based upon the distinction between the use and the operation of the automobile but we believe that the conduct of Roy Brainerd, as its owner and as the named insured under the policy, can only logically be regarded as an express prohibition of both its use and operation. This was a blanket prohibition and it ran to both occupants of the car. It would be anomalous to find an implied permission by Roy Brainerd for Spaeth to operate the car in view of the accepted finding of the trial court that Brainerd affirmatively and emphatically prohibited its use and operation. Such a holding would in effect excise the requirement of permission from the omnibus provisions of the insurance contract.

■ The final argument urged by Inter-Insurance concerns the section in the Travelers' policy which defines the "hazards" covered by the contract. The insuring agreement of the policy provides [the italics in this quotation and those which follow are supplied] that Travelers will "pay on behalf of the *insured* all sums which the insured shall become legally obligated to pay as damages . . . caused by accident and arising out of the *hazards* hereinafter defined." The hazards then are defined as follows:

"DEFINITION OF HAZARDS

"Division 1—Premises—Operations—Automobiles.

28

"The ownership, maintenance or use of the premises . . . and the ownership, maintenance or use of any automobile in connection with the above defined operations, and the occasional use for other business purposes and *the use for non-business purposes of* (1) any automobile owned by or in charge of the named insured and used principally in the above defined operations and (2) *any automobile owned by the named insured* in connection with the above defined operations *for the use of* the named insured, a partner therein, an executive officer thereof, *or a member of the household of any such person.*"

The plaintiff maintains that because Max Brainerd was using the car for a nonbusiness purpose and was a member of the household of Roy Brainerd he therefore became an additional insured under the above quoted hazards provision. The argument proceeds that if Max was an additional insured then it is immaterial whether there was permission from Roy Brainerd to use the Plymouth for as an insured Max himself could grant permission to Spaeth and this permission would bring Spaeth within the terms of the omnibus clause.

We believe this line of argument confuses the purposes of the hazards clause with the omnibus provisions of the policy. The hazards clause does not purport to create additional insureds. It merely defines certain sources of risk and provides, pursuant to the insuring agreement, that if an accident arises out of one of these sources of risk the insured will be covered by the policy. Thus, as the accident herein arose out of Max's use of the car, a source of risk included in the hazards clause, Roy Brainerd as the named insured was to be protected from any liability in-

29

curred by him as the result of the accident. But this clause while defining the scope of the coverage cannot be construed to increase the number of persons insured or protected under the policy. On the contrary it is only the "Definition of Insured" section of the policy which specifically designates who is to be insured:

> "III. Definition of Insured. With respect to the insurance under Coverages A, B and D the unqualified word 'insured' includes the named insured and also includes . . . (2) *any person* while using an automobile covered by this policy, and any person or organization legally responsible for the use thereof, *provided* the actual use of the automobile is by the named insured *or with his permission*. . . ."

This section alone extends the protection of the policy to third persons. One of the requirements is that the vehicle be used with the permission of the named insured. As we have seen the use of the Plymouth at the time of the accident had been forbidden and therefore neither Max Brainerd nor Robert Spaeth became additional insureds entitled to the protection of the Travelers policy.

The judgment of the Circuit Court is affirmed.

Affirmed.

SULLIVAN and SCHWARTZ, JJ., concur.