THELMA SWARTZBERG, Plaintiff-Appellee and Cross-Appellant, *v.* RUTH DRESNER, Defendant-Appellant and Cross-Appellee.

First District (4th Division)    No. 81-304

Opinion filed June 17, 1982.—Rehearing denied July 14, 1982.

Herman Chill and Getzoff & Getzoff, both of Chicago ( Max Chill, William Getzoff, and Steven R. Radtke, of counsel), for appellant.

Richard A. Cowen, of Schuyler, Ballard & Cowen, of Chicago, for appellee.

PRESIDING JUSTICE JOHNSON delivered the opinion of the court:

This action was originally brought to recover losses sustained by

plaintiff, Thelma Swartzberg, from investments made by defendant's husband. Plaintiff sought to impose a constructive trust on the proceeds of the sale of defendant's home based on defendant's alleged promise to repay plaintiff. The trial judge entered judgment in favor of plaintiff on the issue of liability but denied the request for imposition of a constructive trust.

From this judgment, defendant appeals, presenting the following issues for review: (1) whether the trial court erred in finding that defendant agreed to pay plaintiff from the proceeds of the sale of defendant's home, and (2) whether the trial court erred in finding that defendant's alleged agreement to pay her husband's debt was legally enforceable.

Plaintiff cross-appeals, raising the following issues: (1) whether the trial court erred in refusing to impose a constructive trust, and (2) whether the trial court erred in refusing to admit into evidence a letter written by defendant's daughter.

We reverse.

On March 3, 1975, plaintiff, Thelma Swartzberg, formerly known as Thelma Benjamin, filed her complaint against Ruth Dresner, formerly known as Ruth Benjamin. Plaintiff's third amended complaint alleged that Mayer Benjamin owed a fiduciary duty to plaintiff; that Mayer disclosed to plaintiff that he had misappropriated her money; that he would put his home on the market and when it was sold he would pay her the money owed. Defendant, Ruth Benjamin Dresner, also promised plaintiff that when the home was sold plaintiff would be paid the amount due her. Relying on these promises, plaintiff took no legal action to enforce her claim until 1975. Plaintiff requested the imposition of a constructive trust upon the proceeds from the sale of defendant's home or upon other assets into which the proceeds were converted. Plaintiff further alleged that defendant reaffirmed Mayer's promise to pay her when the house was sold and, alternatively, defendant made a new promise to pay plaintiff the amount due when the property was sold. Defendant answered with a general denial of all the allegations.

The following testimony was adduced at trial. Plaintiff, Thelma Swartzberg, testified that she was married to Mayer's brother, Sol. Sol and Mayer owned a wholesale produce company. After Sol's death, Mayer told plaintiff that he would handle her money. Plaintiff turned over all of her money to Mayer—approximately $120,000. He gave plaintiff an allowance out of her monies. Mayer freely bought and sold stocks for her. When he sold the stocks, a check was issued to him and put into his personal account.

In October 1970, plaintiff, while living in Arizona, received a telephone call from defendant, Ruth, informing her that Mayer had

suffered a heart attack and was in the hospital; there was no money. Plaintiff returned to Chicago and when she visited Mayer he said to her, "Temmie, I am so very sorry. I used your money. I know I should not have done this, but I did. And I have no way of paying it back until we sell the house."

Plaintiff and Ruth went to Exchange National Bank in Chicago to examine Mayer's safe deposit box where they found a manila envelope indicating the contents belonged to Thelma Benjamin. The envelope contained stocks. Ruth thanked plaintiff for not putting a lien on their home or suing Mayer. Ruth stated that the only way they could pay their bills would be through the sale of their home.

Plaintiff told defendant that when the house was sold, Mayer and defendant would not have much money left after paying their debts, so she was willing to accept 6% interest on the money owed her until Mayer could repay her. Ruth related this to Mayer; he said it was a good idea but he could not pay the interest at that time. Plaintiff discovered that Mayer was destitute.

Plaintiff did not consult a lawyer because she was promised repayment and trusted Mayer and Ruth. Mayer died in 1972. On May 3, 1974, plaintiff wrote defendant a letter, stating the following:

"Ruth, I do expect payment of the money due me when the house is sold. I know you agree that I have been patient and fair in this matter. Enough time has passed for you to come to conclusions about situations, so I would appreciate very much knowing your plans. My love to the girls and John. And, Ruth, dear, please be happy in your new life, and let's always be good friends. With Love, Temmie."

Ruth did not reply. Later in 1974, plaintiff called defendant and asked whether defendant had sent the money to her in the mail. Defendant responded in the negative and stated that she had not planned to pay plaintiff. Defendant said if things changed at all, there was a possibility of repayment, probably. Plaintiff again wrote defendant a letter on September 17, 1974. She also learned that defendant had sold her home.

Plaintiff stated that Ruth did not handle the finances or participate in business discussions of the produce company. Around 1954 or 1955, plaintiff and Mayer operated a grocery store. In 1958, Mayer became a stock broker.

Plaintiff's counsel introduced into evidence certain portions of the deposition of Jeffrey Rosen. Rosen was an attorney with an accounting background. He was married to Jill, defendant's daughter. Rosen stated that defendant was concerned about the large sum of money owed to plaintiff and that she had to account for it. This occurred during the time Mayer was in the hospital. Defendant told Rosen that Mayer had

supervised plaintiff's affairs and had used some of plaintiff's money to buy stock for himself. Ruth stated that she intended to sell the house and use the proceeds to pay plaintiff and the balance for living expenses. Specifically, defendant told Rosen that plaintiff would be paid out of the sale of the house. Defendant indicated that she was not in a hurry to sell the house because it had no mortgage payments and when she did sell she would have to pay plaintiff, leaving her with less capital.

The deposition of Ida Klein, the sister of Sol and Mayer Benjamin, was also introduced into evidence. She was approximately 72 years old and had a heart problem. Ida stated that defendant told her that as soon as defendant's house was sold, everybody would be paid off. She did not know who was included in the term, "everybody."

Jackie Hackner, defendant's daughter, testified on behalf of defendant. She stated that she was not present when plaintiff talked with her mother about financial matters. In October 1970, plaintiff came to her house to collect some of her possessions. Hackner had found a ledger book that belonged to plaintiff, but she did not understand it. Plaintiff took the ledger book to her son-in-law so that he could look it over. There was a statement to the effect that Mayer owed plaintiff about $29,000.

After cross-examination, plaintiff's counsel examined Jackie Hackner as her witness. The court would not declare Hackner a hostile witness. Plaintiff's attorney was not allowed to read specific sections of a letter that Hackner had written to her Aunt Ida because of defense counsel's objection. The letter was not admitted into evidence.

Jill Rosenstein, called as a witness on behalf of defendant, stated that she was previously married to Jeffrey Rosen. Mayer and Ruth Benjamin are her parents. Her father handled all finances. On October 6, 1970, her mother called, informing her that her father was ill. In the hospital, her father looked pathetic; his skin was pasty, grayish, and his eyes were blurry, not alive. His speech was garbled, thick-tongued. Her sister, Jackie, told her about her parents' financial situation. They decided to allocate part of their salaries to sustain their parents.

On cross-examination, Jill stated that Jeff is not an honest person. In her deposition, she had stated that Jeff was honest. In the hospital, her father could speak and his voice was understandable.

Defendant, Ruth Dresner, testified that she was married to Mayer and they had two daughters, Jill and Jackie. Defendant was 21 years old and Mayer was 39 when they married. Mayer handled all of the household expenses. She did not know how much Mayer earned. She never discussed personal finances with Mayer. All checking accounts were in Mayer's name. He gave her a weekly allowance. In 1952 or 1953, they purchased their home in Calumet City, Illinois. When plaintiff visited Mayer to discuss business, she did not participate in the discussion.

Ruth did not ever know how much Mayer earned annually on any of his jobs. She called plaintiff the night after Mayer became ill and told her of his heart attack. Plaintiff asked, "What should I do?" Ruth said, "Temmie, you know, make up your own mind what you want to do. I'm just telling you that Mayer is very ill." Plaintiff responded, "All right. I will come in."

Ruth discovered that Mayer did not have any money when she sought to write a check to pay a $40 electric bill. There was very little money in the checking account—under $10. She located two other checkbooks that had very low balances. She did not discuss their financial situation with Mayer while he was in the hospital.

Ruth did accompany plaintiff to the Exchange National Bank in Chicago to open a safe deposit box. After they left the bank, they talked about Mayer's condition and nothing else. When plaintiff was at her home, they did not talk about financial matters. Ida, Mayer's sister, loaned her $1,750 to help with expenses. Ray Barton loaned her $8,500 to pay off a bank loan owed by Mayer. She repaid them both prior to her remarriage in May 1974. Before Mayer's death, she and Mayer did not discuss the financial relationship he had with plaintiff.

Between 1970-72, defendant stated that she put her house up for sale because she could not allow everyone to continue to support her. When the house did not sell, she took it off the market.

In May 1974, defendant received a letter from plaintiff. She did not respond. Later, plaintiff called and asked for her money. Defendant told plaintiff that she was not responsible for the payment of the money. Plaintiff then sent another letter. Ruth did not respond to that letter.

On cross-examination, defendant stated that during 1970-72, she did not know that Mayer owed plaintiff any money. She signed a contract on April 20, 1974, for the sale of her home. She received a letter from plaintiff in May. She did not respond because she did not know anything about the money. She did not talk to anyone about the letter. She knew that Mayer ran Benjamin Brothers for plaintiff and that, later, he was handling plaintiff's affairs. When Mayer was in the hospital, she was never there when plaintiff saw Mayer.

When defendant accompanied plaintiff to the Exchange National Bank, it was during the first week of Mayer's illness. Mayer had to sign a card giving authorization to go into the safe deposit box. She never thanked plaintiff for being so understanding in not suing them.

Ruth testified that she paid a debt owed by Mayer to the bank for $8,500. When that debt was paid, the Reading Company stock was released. Jeffrey Rosen helped her transfer the shares of Reading stock. Rosen prepared her 1970 and 1971 income tax returns. After she sold her home, no one advised her not to pay plaintiff.

The trial court gave judgment on the issues of liability for plaintiff;

plaintiff's request for imposition of a constructive trust pursuant to count II was denied; judgment was entered in favor of plaintiff pursuant to count III for $29,109.86 plus interest at 6% from July 23, 1974, which amounted to $10,602.95, for a total of $39,712.81. From this judgment, defendant appeals and plaintiff cross-appeals.

Defendant contends there was no mutual assent to pay her husband's debt. Defendant made no agreement to pay any amount to plaintiff from the proceeds of the sale of the home held in joint tenancy by defendant and her now deceased husband.

The determination of this case depends largely upon the facts to be found in the record. In such situations, the findings and judgment of the trial court in nonjury cases will not be disturbed by the reviewing court, if there is any evidence in the record to support such findings. (*Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 102, 163 N.E.2d 518, 523.) In nonjury cases, the credibility of the witnesses and the weight afforded their testimony are questions to be determined by the trial court. (*In re Estate of Stuhlfauth* (1980), 88 Ill. App. 3d 974, 980, 410 N.E.2d 1063, 1067.) A reviewing court will not substitute its judgment as to credibility of witnesses unless the findings of the trial court are against the manifest weight of the evidence. *Brown v. Zimmerman* (1959), 18 Ill. 2d 94, 102.

In order to prove that an agreement was made by defendant to pay Mayer's debt, plaintiff presented the following evidence: in his deposition, Jeffrey Rosen stated that defendant told him she would pay the debt owed to plaintiff after the sale of her home; plaintiff's testimony also indicated that defendant stated the only way Mayer and defendant could pay their bills would be to sell their home. The only other evidence presented by plaintiff was a letter she wrote to defendant requesting payment. Defendant did not answer the letter.

■■ We find that, without more, the above evidence is insufficient to constitute mutual assent by the parties or to establish that defendant agreed to assume Mayer's debt. In reaching this decision, we note that any agreement to pay Mayer's debt must come from defendant. Further, testimony by other parties does not constitute an agreement by defendant to pay plaintiff but is merely evidence that defendant may have made the agreement. Consequently, plaintiff's evidence was insufficient to establish that defendant agreed to assume Mayer's debt.

Defendant also contends the trial court erred in finding that defendant made an agreement to pay the debt of her deceased husband upon the sale of the home, and the court erred in holding that such agreement was legally enforceable. Defendant asserts that if she had agreed to pay her husband's debt, such agreement falls within the Statute of Frauds and is not enforceable since it was not embodied by a writing signed by defendant.

The principal question is whether the facts above bring this case

within section 1 of "An Act to revise the law in relation to frauds and perjuries" (Ill. Rev. Stat. 1979, ch. 59, par. 1) (hereafter referred to as the Statute of Frauds) so as to relieve defendant of liability.

Section 1 of the Statute of Frauds provides, in pertinent part, as follows:

> "[N]o action shall be brought whereby to charge * * * the defendant upon any special promise to answer for the debt, default or miscarriage of another person, or to charge any person upon any agreement made upon consideration of marriage, or upon any agreement that is not to be performed within the space of one year from the making thereof, unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized."

■■ It is well settled that this portion of the Statute of Frauds, relied upon by defendant, has reference only to collateral undertakings to answer for the debt of another. (*Bonner & Marshall Co. v. Hansell* (1914), 189 Ill. App. 474, 480-81.) Where the agreement is original and independent, it is not within the statute; if collateral, it is. (189 Ill. App. 474, 481.) Whether an undertaking is original or collateral merely, is to be determined, not from the particular words used, but from all the circumstances attending the transaction. (189 Ill. App. 474, 481-82.) The provisions of the statute apply to promises, the main purposes of which are to assume or guarantee the debt of another, and they do not apply to cases in which credit is extended to the promisor, or to cases in which the object or the promise is to promote some interest, purpose or advantage of the promisor. *Duzenbery v. Nimmo* (1923), 228 Ill. App. 448, 452.

■■ In the case at bar, there was insufficient evidence to support the trial court's ruling that defendant made a new promise to plaintiff. A search of the record reveals that there was no writing signed by defendant nor was there testimony by defendant that she agreed to pay her husband's debt. Further, there was no testimony that some interest or advantage was received by defendant that would take the alleged oral promise out of section 1 of the Statute of Frauds. We find that, without proof of a writing, defendant's alleged oral promise to assume her deceased husband's debt is unenforceable because it is in contravention of the Statute of Frauds. Accordingly, the trial court erred by finding in favor of plaintiff on this issue.

In her cross-appeal, plaintiff contends the trial court erred by failing to impose a constructive trust on the proceeds of the sale of defendant's home.

Plaintiff's contention is foreclosed by our holding above that she

cannot recover from defendant because there was no proof of a promise made by defendant to pay plaintiff.

Plaintiff, in her cross-appeal, also contends the trial court erred by refusing to admit a letter dated May 6, 1974, written by defendant's daughter, Jackie Hackner. Plaintiff alleges that Jackie was acting as defendant's agent when she wrote the letter.

■■ The existence of an agency relationship is a question of fact to be decided by the court or jury. (*Lazarus v. Pascucci* (1979), 74 Ill. App. 3d 633, 639, 393 N.E.2d 1074, 1079.) The agent's authority can come only from his principal. (*Mills v. State National Bank* (1975), 28 Ill. App. 3d 830, 834, 329 N.E.2d 255, 259.) The party alleging an agency relationship has the burden of proving it by a preponderance of the evidence. *Lazarus v. Pascucci* (1979), 74 Ill. App. 3d 633, 639-40.

In the case at bar, the record contains no evidence of an agency relationship. There is no evidence which indicated that defendant gave her daughter, Jackie, authority to write a letter on defendant's behalf; and, moreover, Jackie never purported to be acting pursuant to any such authority. Consequently, since the record was devoid of such evidence, plaintiff failed to establish that an agency relationship existed between defendant and Jackie.

Further, we also find that plaintiff's allegation that the letter should be admissible under *res gestae* is without merit. We note that the term, *res gestae*, is no longer used. There has emerged the principle that under certain conditions what has been characterized as " 'spontaneous declarations' " or " 'excited utterances' " are properly admissible as an exception to the hearsay rule. (*People v. Poland* (1961), 22 Ill. 2d 175, 180, 174 N.E.2d 804, 806-07.) Three factors are necessary to bring a statement within this exception to the hearsay rule: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) the statement must relate to the circumstances of the occurrence. *People v. Poland* (1961), 22 Ill. 2d 175, 181.

■■ Under the foregoing analysis, we find that Jackie Hackner's letter would not be admissible because the letter was not a spontaneous and unreflecting statement. Most importantly, the requirement of a lack of sufficient time to allow an opportunity for reflection and invention was not present.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

Reversed.

JIGANTI and LINN, JJ., concur.