**PUBLISHERS ADVERTISING ASSOCIATES, INC.,**
Plaintiff-Appellee,

v.

**The WESSEL COMPANY INC. and Anthony S. Jacobs, Defendants-Appellants.**

No. 83–2447.

United States Court of Appeals,
Seventh Circuit.

Argued May 24, 1984.
Decided Nov. 9, 1984.

Sherwin J. Stone, Altheimer & Gray, Chicago, Ill., for defendants-appellants.

Ronald W. Teeple, Bergstrom, Davis & Teeple, Chicago, Ill., for plaintiff-appellee.

Before PELL and ESCHBACH, Circuit Judges, and WYATT, Senior District Judge.[*]

PELL, Circuit Judge.

Defendants, the Wessel Company, Inc. (Wessel), and Anthony S. Jacobs, appeal from a judgment of $113,462.89, plus interest, entered, after a bench trial, by the district court in favor of plaintiff, Publishers Advertising Association, Inc. Although other issues are raised, particularly one regarding the propriety of piercing the cor-

---

[*] Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

porate veil, the only issue that we need to reach in disposing of this appeal is whether the district court erred when it ruled that the Statute of Frauds did not operate to defeat plaintiff's cause of action arising from Jacobs' representations.

## I. THE FACTS

Publishers is a New York corporation that, among other things, arranges advertising for magazines distributed by Warner Publisher Services, Inc., known at the time of the events of this suit as Independent News Company, Inc. (Independent). Wessel is a relatively small, diversified Illinois corporation, whose primary business is printing and inserting promotional materials into magazines. Jacobs, an Illinois resident, is the sole shareholder and chairman of Wessel. Diversity of citizenship provided the district court with jurisdiction for this case.

In early 1977, Jacobs decided to diversify Wessel's operations. Accordingly, after interviewing several people who responded to an advertisement in a number of prominent newspapers, he hired Bertram Schuster to develop a new venture in an undetermined field, although Jacobs hoped that the new venture would require Wessel's services to some extent. Jacobs and Schuster considered entering the vitamin business, and, to shield Wessel from products liability claims and to insulate Wessel from the venture's creditors should the venture fail, they formed Bart Clayton, Inc. Wessel was the sole shareholder of Bart Clayton, Jacobs was its sole director, Schuster its president and treasurer, and a Wessel employee, Mary Ellen Des Re'Maux, was the only other officer. Des Re'Maux supervised the financial books of Bart Clayton, but continued to appear on Wessel's payroll.

In November 1977, instead of entering the vitamin business, Schuster decided, with Jacobs' approval, that Bart Clayton should publish a self-improvement health magazine called Vital. Wessel initially invested $65,000 in exchange for all shares of Bart Clayton stock. In addition, because Bart Clayton needed funds to meet current expenses, Wessel periodically loaned it the money at eight and one-half percent interest. In total, these loans amounted to $605,000. Bart Clayton never repaid any part of the loans. Schuster eventually gathered a staff of eight employees for the magazine. Bart Clayton continued to maintain its offices on Wessel's premises until just prior to the publication of the first issue of Vital in September 1978. Wessel also filed consolidated income tax returns for fiscal 1977 and 1978, both of which included Bart Clayton.

Schuster first contacted Himmelman, Independent's vice president, in the late winter of 1978. Schuster told Himmelman that Wessel would provide active and extensive financial support for the Vital project, and he referred to Bart Clayton as "a division, a subsidiary, or some form of the Wessel Company." Furthermore, Schuster identified Jacobs as the management of Wessel. Schuster's first meeting with Greenberg, plaintiff's president, was in early April 1978. At that time, Schuster spoke of the financial backing of both Wessel and Jacobs. Schuster testified that he thought that plaintiff was unlikely to provide services to the magazine if the project lacked an established financial backer. References to Jacobs and Wessel provided the needed assurance of financial backing. After plaintiff and Bart Clayton reached a general agreement on a promotion campaign, but before plaintiff expended any funds pursuant to that agreement, Schuster arranged a meeting between Jacobs, Himmelman, and Greenberg. At the May 1978 meeting in New York City, Jacobs assured the two men that Wessel was willing to invest between one and two million dollars in Vital. The three men discussed the proposed advertising and promotional campaigns for the first two issues of Vital; these campaigns met with Jacobs' approval. Plaintiff had previously received Schuster's approval of the plans for the first issue and had placed several orders with various outside firms, but plaintiff would incur no expenses until the campaigns actually ran. After the meeting, Schuster continued to assure plaintiff that Jacobs and Wessel would provide extensive financial backing for the project.

The first issue of Vital, with an October 1978 dateline and a publication run of 325,-000 copies, came out in September of 1978. Schuster published 400,000 copies of the second issue two months later. Evidence at trial suggested that magazine distributors do not determine the success of a publication issue until approximately seventy-five to ninety days after retailers return unsold copies. Yet, within between twenty and forty days after distribution of the first issue, Jacobs began to consider terminating the magazine project because he thought that it required Wessel to commit too much of its resources, that projections were not being met, and because experts advised him that there was little likelihood of success. In early January of 1978, the third issue was completely prepared and needed only printing and distribution, at a cost of $10,000, before it reached the market. On January 7, 1978, Jacobs told Schuster that there was no more money available for the magazine. Neither the third issue nor any subsequent issue was ever published. To this point, Wessel had already invested $670,000 in loans to and shares of Bart Clayton. At the time of Jacobs' decision to terminate, Bart Clayton owed plaintiff $113,462.89. In accordance with statements made to him by Jacobs, Schuster continued to assure all creditors, including plaintiff, that Bart Clayton's bills would be paid. In fact, Bart Clayton never made any additional bill payments.

Plaintiff brought a four-count complaint against Bart Clayton, Schuster, Wessel,

and Jacobs, but Schuster was voluntarily dismissed as a defendant, and Bart Clayton was insolvent. In Count I, based upon the unpaid account, plaintiff named only Schuster and Bart Clayton as defendants. Nonetheless, the district court found "for plaintiff against the remaining defendants on this count because of BC's failure to live up to its clear contractual obligation." Count II alleged that Jacobs and Wessel induced plaintiff to place advertisements on behalf of Bart Clayton and then breached their promise to provide sufficient funding for the magazine to pay plaintiff's charges. The district court held "for plaintiff on this count on the theory that defendants breached an oral contract with plaintiff to be responsible for BC's obligations." Count III alleged that Schuster, as agent for Jacobs and Wessel, made a second promise, later in 1978 or early 1979, to pay the bills that plaintiff had incurred on behalf of Bart Clayton and that defendants breached that promise. Count IV asserted that Bart Clayton was a mere instrumentality of Jacobs and Wessel and, therefore, Jacobs and Wessel were liable for its debts under the doctrine of piercing the corporate veil. The court held in favor of plaintiff against both defendants on Counts III and IV.

## II. STATUTE OF FRAUDS: DEBT OF ANOTHER

Defendants' most compelling argument in support of their attempt to obtain a reversal is that the Statute of Frauds acts as a bar to the imposition of liability against them. They base their defense upon the fact that plaintiff signed an agreement with Bart Clayton before any of the subsequent assurances made by Schuster and Wessel. Therefore, inasmuch as plaintiff asserts that the assurances amounted to mere guarantees that defendants would pay the debts incurred by Bart Clayton, those assurances were agreements that had to be in writing to be enforceable.

The Illinois Statute of Frauds provides, in part:

> That no action shall be brought ... to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person ..., unless the promise or agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized.

Ill.Rev.Stat. ch. 59, § 1 (1983). The parties agree that there was no writing in evidence of defendants' assurances. Therefore, the issue becomes whether the assurances constitute special promises to answer for the debt of another within the meaning of the Statute of Frauds, and, if so, whether any exception exists to the application of the statute.

It is settled law that only a "collateral promise" is within the meaning of the term "special promise" in the Statute of Frauds; an "original" or "independent" promise is not a "special promise" within that statute. The question whether a promise is "collateral" or "original" is a sometimes baffling inquiry. The Illinois courts have generally distinguished between collateral and original promises by looking to the circumstances of the transaction. Thus:

> Where the agreement is original and independent, it is not within the statute; if collateral, it is. Whether an undertaking is original or collateral merely, is to be determined, not from the particular words used, but from all the circumstances attending the transaction. The provisions of the statute apply to promises, the main purposes of which are to assume or guarantee the debt of another, and they do not apply to cases in which credit is extended to the promisor, or to cases in which the object of the promise

is to promote some interest, purpose or advantage of the promisor.

*Swartzberg v. Drezner*, 107 Ill.App.3d 318, 324, 63 Ill.Dec. 211, 216, 437 N.E.2d 860, 865 (1982) (citations omitted). *Accord Hodgman, Inc. v. Feld*, 113 Ill.App.3d 423, 432, 69 Ill.Dec. 233, 239, 447 N.E.2d 450, 456 (1983) (alternative holding). As for collateral promises, "[a] promise to pay the debt of another which is not written and duly signed cannot be enforced either at law or in equity." *Brown & Shnitzky Chartered v. Dentinger*, 118 Ill.App.3d 517, 519, 74 Ill.Dec. 98, 99, 455 N.E.2d 128, 129 (1983). For this provision of the Statute of Frauds to apply and require a writing, however, there must be an existing debt at the time of the alleged guarantor's assurances. *Raveret-Weber Printing Co. v. Wright*, 301 Ill.App. 421, 428, 23 N.E.2d 203, 206 (1939); *Early v. Cassens*, 216 Ill. App. 581, 586 (1920).

This court has previously held that, when an assurance of financial backing is made before a debt arises, the promise is original, and the Statute of Frauds is inapplicable. *United States v. Mitchell*, 74 F.2d 571, 576 (7th Cir.1934). In a recent diversity case applying Indiana law, as opposed to the Illinois law that applies here, we expressed our dissatisfaction with the nomenclature used in Statute of Frauds cases, finding that courts usually label an assurance as an "original promise" or a "collateral promise" depending "upon the court's view of the intent of the parties to the agreements, and quite frequently courts use these terms in stating conclusions rather than in providing a workable test for analyzing an agreement." *Henry C. Beck Co. v. Fort Wayne Structural Steel*, 701 F.2d 1221, 1225 (7th Cir.1983) (citations omitted). Nonetheless, we note that the *Beck* case covered a promise between a *debtor* and a third party not within the debtor-creditor relationship whereas the Statute of Frauds issue only arises when the *creditor* in a debtor-creditor relationship seeks to hold a third party to his assurances that he will satisfy the debtor's obligations. Thus, *Beck* did not need to discuss the ramifications attendant upon the distinction between original and collateral promises. Other federal circuits have followed the collateral/original distinction to determine if the promise of a party who is extraneous to an initial undertaking must be in writing to satisfy the Statute of Frauds. *E.F. Hutton & Co. v. Berns*, 682 F.2d 173, 178–80 (8th Cir.1982); *Schepp v. Langmade*, 416 F.2d 276, 278 (9th Cir. 1969); *Brown & Root, Inc. v. Gifford-Hill & Co.*, 319 F.2d 65, 68–69 (5th Cir.1963). Furthermore, Illinois law mandates that we observe the distinction, as the previously discussed Illinois cases illustrate.

Illinois courts also hold that the determination whether a promise is original or collateral is a question of fact. *Early v. Cassens*, 216 Ill.App. at 586. Thus, the clearly erroneous standard of Federal Rules of Civil Procedure 52(a) applies to our review of the district court's findings.

By the time Jacobs met with plaintiff's president in May 1978, Schuster had already negotiated a general agreement between Bart Clayton and plaintiff for a promotion campaign for Vital. While plaintiff had made some initial arrangements with respect to the first issue of Vital before the New York meeting, its obligations to the ultimate providers of promotional services would not arise until they executed the planned campaign, which was then still several months in the future. Consequently, although there was an executory contract between Bart Clayton and plaintiff, no debt yet existed running from Bart Clayton to plaintiff at the time of the meeting. At the meeting, Jacobs expressed his approval of the advertising and promotional campaigns for the first two issues of Vital. He also assured plaintiff that he and the Wessel Company, of which he was chairman and sole shareholder, would invest at least one million dollars in the magazine. Defendants never claimed that Jacobs was not authorized to bind Wessel to a contract.

The trial court found this assurance of funding to be an independent promise of both Jacobs and Wessel to provide extensive financial backing for Bart Clayton. The evidence established that defendants infused considerably less money than one million dollars into Bart Clayton, and thus they failed to satisfy the express promise made to plaintiff by Jacobs. Based upon the record before us, we are unable to conclude that the district court was clearly erroneous when it found that Jacobs' assurances constituted an independent promise to finance Vital. In fact, our independent review of the evidence convinces us that, even if we were to view the collateral/original issue as a question of law subject to plenary review, we would reach the same result. Without a pre-existing debt owed by Bart Clayton to plaintiff, the *sine qua non* for application of the relevant provision of the Statute of Frauds is absent here. Thus, under Count II, both remaining defendants are liable for the entire amount owing to plaintiff due to the breach of their promise to provide sufficient funding to pay plaintiff's charges. The district court also ordered defendants to pay plaintiff interest of five percent per year on the amount owing, from January 1, 1979, until June 23, 1982, the date of the trial but approximately one year prior to the date of the district court's decision. Defendants did not appeal from this aspect of the case, nor did plaintiff cross-appeal. Therefore, we affirm the award of $113,-462.89 plus the aforementioned interest on Count II.

The district court entered judgment in favor of plaintiff on all four counts of the complaint. Each count requested identical relief, the full amount of which the district court ordered on Count II. Since we affirm the district court's judgment as to Count II, we can conceive of no reason to expend further judicial resources in analyzing the legal questions presented by Counts I, III, and IV. Plaintiff would receive no further relief if we held against defendants on those counts, nor would de-

fendants' obligations be mitigated in any respect were they to receive a favorable ruling from this court on those counts. We express no opinion about the district court's disposition of Counts I, III, and IV.

Consequently, we AFFIRM the district court's disposition of Count II, and we REMAND Counts I, III, and IV, with directions to the district court to VACATE its decision on those counts.

Costs to plaintiff.