VERA NEMETH, Plaintiff-Appellee, *v.* KORNELIA BANHALMI *et al.*, Defendants-Appellants.

First District (5th Division) No. 83—1624

Opinion filed April 19, 1984.—Rehearing denied July 11, 1984.

940

Glen H. Kanwit and William Carlisle Herbert, both of Hopkins & Sutter, and Barry A. Feinberg, of Chuhak, Tecson, Kienlen & Feinberg, both of Chicago, for appellants.

McDermott, Will & Emery, of Chicago (Robert T. Palmer, of counsel), for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

Defendants appeal from a judgment for plaintiff in an action for malicious interference with an expectancy and abuse of a confidential relationship. They contend that (1) plaintiff failed to exhaust her probate remedies; (2) plaintiff did not prove the essential elements of her cause of action; and (3) the trial court's findings with regard to liability and compensatory damages are contrary to the manifest weight of the evidence.

Plaintiff Vera Nemeth (Vera), born in Hungary in 1922, is the sole surviving child from the marriage of Rose Goldner (Rose) and Eugene Jacobovich (Eugene). After Eugene's death, Rose married Paul Sternberg (Paul) in 1929; the sole issue of that marriage was defendant Kornelia Banhalmi (Kornelia), born in 1935. In 1956, the family came to the United States, settling in different parts of the country: Rose and Paul lived in Norfolk, Virginia; Kornelia, by then married to defendant George Banhalmi (George), lived in suburban Cook County, Illinois; and Vera, with her daughter Eva, lived in Los Angeles, California. Rose and Paul opened a gift shop in Norfolk, financed in large part by jewelry and gold coins Rose managed to remove from Hungary concealed in her clothing. Their business prospered, and before their retirement in 1972, they added two parcels of income property to their holdings—an 18-unit apartment building (the Del Argo Apartments), and a smaller parcel containing three rental units (the Granby Street property). Rose and Paul agreed that Vera and Kornelia would be treated equally upon their deaths, and in 1975 they executed identical wills, each leaving the estate to the other, if surviving, and if the other spouse was not alive, leaving the estate equally divided between Vera and Kornelia (the 1975 will).

In the fall of 1975, Vera moved to West Germany to reside near her recently-married daughter, and opened a small business there. Shortly thereafter, Rose suffered a stroke and Kornelia went to Nor-

folk to assist her parents. Because of her own health problems, she brought Rose and Paul back to the Chicago area, where Rose was immediately hospitalized and Paul resided with Kornelia, George, and their daughter Susan. When Rose died in December of 1975, Paul (then 86) decided to remain in the Chicago area and lived with the Banhalmi family until September 1978, when he was placed in a nursing home.

In the summer of 1976, while Vera was visiting from Germany, Paul executed a new will, again providing that Vera and Kornelia would share equally in his estate (the 1976 will). After Paul died in November of 1978, Vera was unable to locate the original of this 1976 will and submitted a copy thereof for probate on the theory that the original was lost.[1] At that time, she first learned that there was a subsequent will, executed on January 31, 1977 (the 1977 will), which provided that she should receive the Granby Street property and 50% of such corporate stock as remained at the time of Paul's death. The balance of his property, both real and personal, was left to Kornelia. However, it further appeared that Paul destroyed the 1977 will shortly after it was executed. Since he had never adopted Vera, his entire estate passed to Kornelia as the sole heir under the laws of intestacy.

Kornelia petitioned the probate court for letters of administration, and Vera filed a complaint against Kornelia and George in that proceeding, alleging malicious interference with her expectancy under the 1976 will.[2] The probate court dismissed her complaint without prejudice, ruling that it was improperly brought as a supplemental proceeding. Vera then refiled her complaint in circuit court, seeking damages for malicious interference with her expectancy and abuse of a confidential relationship. The trial court dismissed that complaint for failure to state a cause of action, but we reversed that order and remanded for further proceedings in *Nemeth v. Banhalmi* (1981), 99 Ill. App. 3d 493, 425 N.E.2d 1187.

On remand, the action proceeded to trial, and Vera testified that although Paul never adopted her, she was raised in his household from the age of seven and was treated by him as his daughter. She used the name Sternberg socially, and always referred to Paul as her

---

[1] Vera's motion to voluntarily dismiss the action was granted in January of 1980.

[2] Vera also filed a claim against the estate, alleging the existence of a contract between Rose and Paul under which they agreed to make wills for the equal benefit of Vera and Kornelia, and a breach thereof by Paul. In January of 1980, Vera's motion for leave to withdraw her claim was granted when it appeared that the estate assets were insufficient to satisfy her claim.

father, just as he referred to her as his daughter, and treated her daughter Eva as his granddaughter. She acknowledged that there was a rift in the relationship with her parents when she married Emery Nemeth and converted from Judaism, but explained that their attitude changed after she and her husband sheltered them and Kornelia during the Nazi occupation of Hungary by creating false papers for them and hiding them in their home. Vera further testified that their close familial relationship continued after immigration to this country, despite the fact that they settled in different areas. They maintained contact through letters, phone calls, and yearly visits. During one such visit, Rose and Paul told her and Kornelia of their intention to divide their estate equally between the two girls. It was further planned that if Paul should die first, Rose would reside with Vera, and if Rose died first, Kornelia would care for Paul.

Vera also stated that she was in West Germany when her mother suffered a stroke, and returned home when informed that Rose was near death. At that time, Kornelia told her that their mother had taken several pieces of valuable jewelry with her when first hospitalized in Norfolk, and that it had disappeared; however, no police report was made, and the jewelry was not insured. After she (Vera) returned to Germany, Kornelia informed her that Paul had moved in with her, that they were renting a larger home to accommodate him, and that Paul contributed to the rent but gave her nothing for his board and care. However, when she visited again in the summer of 1976, she learned for the first time that Kornelia and George had purchased the house in joint tenancy with Paul, and that Paul had provided the entire $15,000 down payment. He explained to her that he agreed to the arrangement because he feared that if he did not, they would put him in a nursing home. He further proposed that they marry and he return to California with her, but she did not take his proposal seriously. When confronted, Kornelia did not explain why she had written that they were renting the home, stating merely that the arrangement was more practical than renting.

Vera further testified that during this visit, Paul executed the 1976 will, gave her $5,000, and promised to send her $10,000 more in monthly payments. He also decided to give each of Rose's daughters a portion of her jewelry, which he had inherited on her death. They took the jewelry for appraisal, then Paul gave her a diamond pin valued at $15,000, gave Kornelia a share of equal value, and retained $9,000 worth himself, promising that it would be divided between them on his death. Vera also stated that she knew this did not represent all of the jewelry and gold coins their mother owned, but Kornelia did not

mention being in possession of other jewelry, or that their mother had given certain items of jewelry to her before her death. After this action was filed, additional jewelry which had belonged to their mother was located in Kornelia and George's safe deposit boxes; however, four pieces that she remembered were still missing—a matching diamond and sapphire pendant and ring, a large diamond solitaire ring, and a watch with a diamond bracelet.

Vera next stated that she returned to West Germany, where she remained until the fall of 1977, when she moved back to Los Angeles. She did not see Paul during 1977, but did hear from Kornelia on several occasions. Kornelia frequently wrote that Paul had suffered business losses and was therefore reluctant to comply with his promise to give her $10,000. Kornelia also told her that Paul suffered a mild stroke in May of 1977, and had become confused and had difficulty remembering things. According to Kornelia's letters and telephone calls, Paul became increasingly difficult throughout the fall of 1977, locking other family members out of the house, slamming doors, and acting childishly. However, Kornelia represented him as still sharp in business matters and able to handle his affairs, although he expressed fears that he might have to flee from nonexistent creditors and was afraid that "they" were trying to take his money away from him. She further represented that Paul was refusing to give them money, even though he was dependent on them for his care; she did not tell Vera that Paul had pooled his assets with theirs, or that George was assisting him in handling his business affairs. Throughout this period, she (Vera) received no letters from Paul and was rarely able to speak with him more than briefly during telephone calls; for the most part, when she called, members of the Banhalmi family gave some excuse why he could not come to the phone.

In early 1978, Kornelia told her in a letter that it had been a difficult two years, and a doctor had advised her that Paul would become more and more difficult to handle. There were constant arguments about money matters, and she and George had to pay most of Paul's expenses out of their own funds. Later, in April 1978, Kornelia wrote that if Paul's mental or physical condition became any worse, it would be necessary to place him in a nursing home. However, she (Vera) did not see Paul herself until June of 1978. At that time, she was shocked at his condition; he was very childlike and called her by her mother's name. She proposed that he return to California with her, fearing that his health was such that he could not survive winter weather. Kornelia seemed to approve of that plan, but when it was proposed to George, he turned white and appeared frightened. Because of this re-

action, and because it appeared that Paul was incapable of handling his own affairs, she asked for an accounting of what had happened to Paul's income and property, explaining to George that as an equal beneficiary she felt that she was entitled to an accounting. George refused, but neither Kornelia nor George told her of the 1977 will or its subsequent destruction. Upon her return to California, she continued to ask for information about Paul's health and finances and pursued her plan to bring him to California until Kornelia and George, as well as Paul's doctor, informed her that the move would endanger his physical and mental condition. Kornelia and George did not notify her that Paul had been declared incompetent, or that Kornelia had been appointed as his guardian. She did not learn of Paul's death until one week thereafter, at which time Kornelia told her she was not informed because Paul did not want her at his funeral, or even notified of his death.

Vera further testified that during her lifetime, Rose always treated her daughters equally, giving both of them gifts of money and jewelry. She also received letters from Paul, signed "Father," before he moved in with the Banhalmi family; thereafter, the most he did was sign letters written by Kornelia. Prior to her death, their mother had a number of gold coins, both foreign and American; now only Kornelia and George would know what happened to those coins or to jewelry which Paul inherited from their mother.

Kornelia, called as an adverse witness, testified that even as a child she was always treated more favorably than Vera, and that Paul did not like Vera and treated her as a distant relative. She (Kornelia) felt guilty about this and frequently begged Paul to give Vera things and to treat her better. In 1974 or 1975, Rose took her to her safe deposit box in Norfolk and gave her some of the jewelry, then told her that upon her (Rose's) death she was to take the rest of the jewelry and keep it. Her mother explained to her that Vera "had already received more than her share," but suggested that she not tell Vera about it. She complied because it was her mother's wish and because she preferred to avoid a confrontation with Vera. When it appeared that records from the Norfolk bank did not confirm that Kornelia visited the box at the times indicated, Kornelia denied giving this testimony and said she never accompanied her mother to the safe deposit box. Kornelia also stated that Paul chose to live with her after Rose's death, and insisted on paying his own way. It was his suggestion that they purchase a house rather than rent, and Vera was not told of this arrangement because it was Paul's wish that she not know. She acknowledged that after Rose's death, Paul was presented with three

options: he could remain in Norfolk and hire a housekeeper, move to the Chicago area and hire a housekeeper, or move in with them. He was aware that if he chose the last option, it would be necessary to find larger living quarters. It was also Paul's suggestion that he pay them $1,000 per month toward expenses; however, when that proved impractical, they pooled their resources, again at Paul's suggestion. Kornelia asserted that there was no record of how these funds were spent because they did not keep check registers once they were filled.

Kornelia further testified that Paul returned to Norfolk for a few days after Rose's death, accompanied by George, in order to wind up his affairs there. When he returned, he opened a savings account at Crawford Bank (the Crawford account) with an initial deposit of over $15,000, and a safe deposit box at Norfolk Trust and Savings Bank (Paul's box). Her name was also on the Crawford account, but she denied that George was on the account. Upon seeing bank records, she admitted that George's name was added to the Crawford account in August 1976, and that Paul's box was rented in all three names. She also stated that she drove Paul to the bank frequently, but denied that she ever made deposits or withdrawals from the Crawford account; however, when shown bank records, she acknowledged that a number of withdrawal slips on that account were signed by her or George. Kornelia admitted that $20,531.35 was deposited on March 19, 1976, followed by a $10,000 withdrawal the same day; however, she could not explain where the money came from or what was done with the $10,000. In October 1978, after Paul was declared incompetent, she and George withdrew the remaining $2,000 from the account, but she could not recall what they did with that money.

Kornelia also stated that when Rose suffered a stroke in 1975, she had to go to Norfolk to help because Paul could not cope with the situation. After Rose's death, Paul did depend on her to an extent. When Paul moved in with them, he might have brought some gold coins with him, and she remembered seeing coins on his dresser along with important papers, including a number of stock certificates. She later contradicted this and stated that those coins were in their safe deposit box and had never belonged to Paul. When Vera visited in 1976, she learned that Paul had provided $15,000 for the down payment on the house, and angrily demanded that Paul also give her $15,000. At the same time, Vera demanded a division of their mother's jewelry, and she agreed to it although this was the jewelry that their mother had given to her. She acknowledged that she did not tell this to Vera and, as a result, she might have gotten the impression that Paul was giving her the jewelry. Kornelia admitted stating in a

deposition that the jewelry was Paul's, but asserted that she was mistaken on that earlier occasion. In the division of the jewelry, Vera's share was valued at $15,000, while her share had a value of only $13,000; Paul asked to keep a share, but Vera talked him out of it. Kornelia did not explain why Paul would ask to keep a share if Rose had given the jewelry to her, but stated that her ownership thereof "might not have been all that clear cut." She also could not explain how her share could have been worth only $13,000, when the jeweler's appraisal showed that the items remaining after Vera received her share had a value of $22,000.

Kornelia acknowledged that it had always been her understanding that Rose and Paul's estate would be divided equally between the two daughters, and that Paul made a will to that effect in 1976. However, in 1977, Paul decided to make a new will, and she and George were present when he discussed its provisions with the attorney as well as when he executed it. After Paul's death, she searched his effects for the original of the 1977 will but could not find it; she never saw him destroy any will.

Kornelia denied that Paul's behavior changed after the 1977 stroke or that she discussed his poor mental condition with Dr. Mohacsy at that time, although she admitted writing a letter stating that he had a poor memory and complained that people were trying to take his money away from him. In late February 1978, Paul suddenly decided to give her all of his stock, mentioned in the 1977 will, and signed in her presence the stock certificates which he kept in his bedroom. Although the certificates were signed on March 1, they were not transferred until October, after Paul had been declared incompetent. The stock in question consisted of 200 shares of Exxon, 100 shares of General Motors, 100 shares of AT&T, and several shares of Chrysler. She further testified that at his death Paul had a few thousand dollars in cash, the Granby Street property, subsequently sold for $100,000, and the Del Argo Apartments, later sold for $380,000, and a joint interest in their home; he owned no gold coins, and no jewelry other than a gold watch. She also stated that George helped Paul with financial matters at his request, and that large bills were paid out of their joint account. Kornelia admitted that she, Susan, and Paul took a trip to Jamaica in 1978 which was financed from that account, but denied that trips she, George, and Susan took to Florida and Hawaii while Paul lived with them, or their trips after his death to Taiwan and the Middle East, were paid for with those joint funds. She stated that one factor in having Paul declared incompetent in September of 1978 was to keep Vera from gaining control over him;

Paul understood this and agreed to it.

Kornelia asserted that she never threatened to place Paul in a nursing home if he did not give her money and help purchase a house, nor did she ever tell him that he was suffering extensive business losses or that the cost of a nursing home was prohibitive. However, it was possible that she told him Vera was not an honest person and that she was emotionally disturbed, but this was to excuse her behavior toward him as illness, not meanness. Although Paul had always been somewhat eccentric and absent-minded, he was in good physical and mental health throughout 1977 and into 1978; he visited with friends during that time and played chess. She answered Vera's letters to Paul because he did not want to write to her, not because he was incapable of doing so. Kornelia further testified that she and Paul had a very close relationship, and he told her in February or March of 1977 that he tore up the 1977 will to ensure that she, his natural daughter, would get everything and Vera, whom he did not like, would take nothing. Finally, Kornelia acknowledged that she and George had one safe deposit box before Paul came to live with them, but opened several more while he was residing there; they kept important papers, their jewelry, and George's coin collection in those boxes.

The evidence deposition of Dr. Mohacsy, a psychiatrist, was admitted and she stated therein that she and Vera had been friends for 40 years. She knew the Sternbergs and Banhalmis in Hungary, and Kornelia called her seeking advice shortly after Paul suffered a stroke, although she could not remember whether that call took place in 1977 or 1978. During the call, Kornelia described Paul as senile and irritable, complaining that he was acting peculiarly, was forgetful and misplaced things, and that it was impossible to communicate with him.

Dr. Littman, Paul's physician, testified that he treated Paul from February 1976 until his death. He did not remember each visit, but stated that his office notes disclosed that Paul suffered from mild emphysema in early 1976 and was hospitalized for pneumonia in September of that year. At that time, his emphysema was moderately severe, and an EKG showed probable remote damage to his heart. When he first met Paul, he spoke intelligently, and he did not note any signs of confusion until 1978. Dr. Littman further testified that Paul suffered a mild stroke episode in May 1977, and denied telling Vera that he suffered a series of small strokes. On September 2, 1978, he signed an affidavit stating that he examined Paul on that date and found him confused, disoriented as to time, place and person, and physically and

mentally incapable of maintaining himself or exercising judgment in his own behalf. Dr. Littman acknowledged that his office notes did not reflect an examination on that date, but he remembered the Banhalmis telling him that Paul was confused and unable to manage his personal hygiene. In his opinion, the symptoms were indicative of cerebral arteriosclerosis, and Paul was suffering from senile dementia. He arranged Paul's admission to a nursing home, and the diagnosis given at that time was chronic organic brain syndrome. Dr. Littman further testified that he listed Paul's cause of death as cerebral thrombosis brought about as a result of five years of advanced cerebral arteriosclerosis, but asserted that, since no autopsy was performed, he did not know the exact cause of death, which could just as easily have been a heart attack. On cross-examination, he asserted that people suffering from arteriosclerosis can function normally.

Dr. Arieff, a psychiatrist and neurologist, testified that he had examined Paul's medical records as well as depositions and, in his opinion, Paul suffered from progressive mental deterioration which reached a severe degree of dementia in September 1978, when he was declared incompetent. Such a condition is rarely precipitous; the deterioration would have taken place over an extended period of time. He found signs of deterioration for over a year before Paul was declared incompetent, and it appeared that this deterioration was intensified by the May 1977 stroke, as well as by the decreased flow of oxygen caused by emphysema. Hospital records from his 1976 admission indicated that nurses had difficulty obtaining a medical history and communicating with him, and that Paul was at times agitated and confused; however, while those could be signs of dementia, they could also be the result of fever. In his opinion, Paul was not able to manage his personal economic affairs from 1977 to his death in 1978.

Nicholas Burczyk, an expert in handwriting analysis, testified that he had compared signatures on Paul's stock certificates with known examples of his handwriting and, in his opinion, taking into account that Paul was an elderly gentleman, Paul did not sign the stock certificates. He acknowledged that he did not have the original documents, but believed that he could give a reasonably accurate opinion because the copies were very clear.

George, called as an adverse witness, testified that in 1975 his after-tax income was $16,531.23, he had little savings, and he rented his home; therefore, one reason he agreed to Paul's moving in with them was the chance to improve his financial standing. However, he liked Paul and would have taken him in under any circumstances. At the time of Rose's death, he and Kornelia had one safe deposit box in

which they kept important papers, jewelry, and his coin collection. When Paul arrived in 1976, they opened a second box in all of their names, and he visited that box many times with Paul. He acknowledged that, with the exception of one admittance ticket signed by Paul in January 1976, he signed all the tickets on that box, but asserted that this did not mean he always entered the box; it was possible that he signed the ticket, but Paul entered alone. George also testified that he visited his sole safe deposit box a total of 21 times between 1972 and 1974, and that he was a signatory on four boxes from 1976 through 1978, which he visited a total of 108 times; a fifth box was opened in 1979. George could not remember the purpose of each particular visit, but speculated that most were in connection with his growing coin collection. He kept his collection and books in those boxes and would enter them to study his coins, compare them to the books, and add to the collection. The collection was not particularly valuable and was purchased from his salary. The bulk of the collection, approximately 70%, was acquired in 1979-83; 10% was acquired in 1976-78.

George further testified that Paul's tax returns reflected the following after-tax income from his Norfolk property: $25,970.22 in 1976; $22,075.41 in 1977; $19,324.45 in 1978; and $19,375.01 in 1979 (estate return). This money was placed in their joint fund, and he could not recall exactly how the money was spent; he acknowledged that when they pooled their funds, his and Kornelia's names were placed on Paul's account, but Paul's name was not added to their account, and he had no joint checking account with Paul. The only expenditure he specifically recalled making from those pooled funds was the purchase of a new automobile in his own name in 1977. During this same period, he and Kornelia had the following income: $18,150.39 in 1976; $21,904.33 in 1977; $21,500 in 1978; and $28,745.45 in 1979. In 1980, they had income of $24,624.47, and included in their return income from the Del Argo Apartments; in 1981, they had income of $39,733.80, but that return did not reflect the sale of the Del Argo Apartments. It sold for $380,000 but was subject to a $100,000 loan which they took out after Paul's death to pay taxes and other expenses, including litigation expenses. George also stated that he saw Paul sign the stock certificates on March 1, 1978, but could not explain why dividends received in 1978 were reported on Paul's estate tax return rather than on their income tax return.

George asserted that it was Paul's idea to buy the house, and he decided to provide further money to pay for expenses and repairs when it became apparent that he and Kornelia could not manage on

their income. Paul made the 1976 will at Vera's request, and shortly after executing the 1977 will, Paul stated that he was unhappy with it and wanted to favor Kornelia even more; later, he said there was no will. Paul was mentally alert until two months before he died, and it was only then that he began to seem forgetful; prior to that, he frequently practiced the piano and played chess.

Robert Homer, a jewelry appraiser, testified that when opened pursuant to discovery, the Banhalmi's safe deposit boxes contained jewelry with a replacement value of approximately $50,000. He also examined the coin collection contained therein and found it to be of very little value, including as it did rolls of 1980-81 pennies, nickles, and dimes. He estimated the value of the entire collection at $5,697.80, including 11 gold coins of moderate value. The four missing pieces of jewelry described by Vera were not in the box; however, based on her descriptions and pictures of similar pieces, he estimated that the unaccounted-for items were worth between $25,500 and $121,000, depending on the quality of the stones, which he had no means of evaluating.

Nicholas Simon, a defense witness, testified that he had known George and Kornelia since 1957, and first met Paul at their home in 1976. At that time, Paul seemed very alert and conversed intelligently about the theater and the arts. He visited their home eight to 10 times in 1977 and played chess with Paul on several occasions; Paul was a skilled player and frequently won their games. He appeared to have a close, affectionate relationship with the Banhalmi family but never spoke of Vera. Simon stated that he did not speak to Paul very much in 1978, and could not judge his mental condition at that time.

Pearl Abrahamson, a psychiatric social worker, testified that she had known the Banhalmis for 22 years. She met Paul frequently at their home, and during those visits he spoke knowledgeably and intelligently about political and historical matters, as well as current events, particularly Jewish issues and his own experiences during the Nazi occupation of Hungary. He had a warm, loving relationship with his family and participated actively with them in social events. She never noticed anything unusual about Paul's behavior, but had not seen him for several months before he died. Abrahamson further testified that she met Vera on two occasions; the second time, in 1976, she was shocked to hear Vera speak seriously of marrying Paul.

Julia Curry, director of the speech and hearing clinic at the University of Illinois, testified that she first met Paul in 1976 when Kornelia brought him in for a hearing evaluation. He was alert and friendly and adapted well to the hearing tests, giving rapid responses.

His mental condition remained the same on the various occasions she saw him throughout 1976 and 1977. Curry also testified that she saw Paul in August 1978 and he seemed tired, but she did not have an opportunity to converse with him at length. She acknowledged that she first met Kornelia in 1971 when she (Curry) served as her college faculty adviser, and they thereafter became friends.

Dr. Herron, a psychiatrist, testified for the Banhalmis that he had reviewed Paul's medical records as well as depositions given in the case and, in his opinion, Paul was not mentally disabled in 1977 but was disabled shortly before his death in 1978. If Paul were suffering from senile dementia, tests would have shown a loss of past and recent memory and a change in personality, and he would have had a history of confusion, unreliability, and inability to care for himself adequately. However, Paul's medical records did not reflect any tests, and the material reviewed did not suggest such a history, other than episodes of confusion during his 1976 hospitalization, but that was probably attributable to the fever he suffered at that time rather than senile dementia. The average duration of senile dementia is three to four years, and the disease might be characterized by increased forgetfulness, preoccupation with bodily functions, childlike conduct, and increased agitation. Dr. Herron stated that he had not seen Dr. Littman's affidavit from the September 1978 incompetency proceeding, but it would not change his opinion, since he knew that Paul had been declared incompetent at that time. He acknowledged that Kornelia's description related to Dr. Mohacsy was indicative of a person who might be demented, but he was unable to ascertain whether that description was given in 1977 or 1978. If Paul was exhibiting such conduct in 1977, he would be inclined to agree with the diagnosis of senile dementia, and that Paul was dementing in 1977; however, if his behavior was of shorter duration, he would be more inclined to attribute it to a stroke or similar, sudden disorder.

Laslo Boldizsar, an attorney, testified that he first met Paul in 1976 in connection with the purchase of the Northbrook home. Later, he prepared the 1976 will at Paul's direction, and Paul came to his office accompanied by Vera, Kornelia, and George to execute it. Paul was very alert at that time and wanted to be assured that signing the will would not prevent him from dealing with his property as he wished during his lifetime. Approximately six months later, Paul called and said he wanted to change the will in order to convey substantially more of his estate to Kornelia, explaining that he felt that distribution was only fair since he was living with her and being taken care of. Paul was quite coherent and, when shown a draft of the 1977

will, insisted upon including a clause expressly providing that he could dispose of any of the property during his lifetime. Kornelia and George were present during this interview, and he explained the laws of intestacy to Paul; he knew at the time that Vera was not adopted. Boldizsar stated that he prepared the new draft as Paul requested, and he came to the office to sign it accompanied by Kornelia and George. On both occasions, Paul appeared to be of sound mind and memory, and he noticed nothing unusual about his behavior or mental ability. The original of the 1977 will was given to Paul, and a short time later Susan Banhalmi called and said Paul wished to speak to him. Paul then took the phone and said he wanted to annul the 1977 will because he had decided that it was only fair that Kornelia receive everything. Paul wanted a special document annulling the will, but was informed that all he had to do was destroy the will. He asked if witnesses were needed, and he (Boldizsar) informed him by letter that no witnesses were necessary. He had no further contact with Paul.

Boldizsar further testified that Vera called his office in 1978, asking if he had the original of the 1976 will. He told her that he searched his files and could not find it, but it did not occur to him to tell her about the 1977 will. He acknowledged that he did some legal work for George and Kornelia, including drafting their wills and handling the sale of Paul's Norfolk real estate. He also stated that calls from Paul were usually initiated by a member of the Banhalmi family, and he had no way of knowing whether they stayed on the line during his conversations with Paul.

Roger Simon, Boldizsar's law partner, testified that he witnessed the execution of the 1976 and 1977 wills. On both occasions, Paul appeared to be of sound mind and memory, and he observed him conversing with others and answering questions; however, he did not talk to Paul and did not know the content of the conversations that took place, since they were conducted in Hungarian—which he does not understand.

James Hayes, an expert in document examinations, testified that he compared the signatures on the stock certificates with known examples of Paul's signature and, in his opinion, the differences therein were within the range of variation of one writer. His opinion was influenced in part by the fact that the signatures had a natural appearance and did not bear the common characteristics of forgery. Hayes acknowledged that there was a large variation in the signatures, but stated that it was necessary to take into account that the writer was quite elderly. He agreed that it was possible, but unlikely, that someone other than Paul signed the stock certificates.

Susan Banhalmi testified that she frequently accompanied Paul to concerts, movies, and senior citizen centers in 1976 and 1977. He was mentally and physically well during that time, but began to deteriorate toward the end of 1978. In 1977, she called Mr. Boldizsar for Paul, at his request, then handed him the phone and left the room; her parents were not home at that time. Paul frequently asked other members of the family to dial numbers for him. She further stated that Paul seldom talked about Vera, and she (Susan) knew that he disliked her, although she did not know why. They did not seem to get along very well, and Paul was not pleased with her visit in 1978, preferring not to be in the same room with her. Susan also testified that the gold coins in the family's safe deposit boxes belonged to her, and were given to her as gifts by her grandmother over a period of years. The other coins belonged to her father, who had had a collection for many years. She often saw him going through the collection at home during the evening, consulting various books. Susan later added that when the collection got larger, her father placed it in safe deposit boxes.

Kornelia and George also testified in their own behalf, making statements consistent with those contained in their examination as adverse witnesses.

In an extensive memorandum opinion, the trial court found that Vera had an expectancy under the 1976 will; that there was a reasonable certainty that she would have received a devise of one-half of Paul's estate but for defendants' interference; that their interference was tortious; and that Vera was damaged thereby in the amount of $300,000. It awarded judgment for Vera in that amount, and assessed an additional $79,667.25 in punitive damages against defendants. Defendants' post-trial motion seeking vacation or modification of the judgment was denied, and this appeal followed.

OPINION

Defendants first contend that the judgment should be reversed and plaintiff's complaint dismissed, because an action for malicious interference with an expectancy under a will may not be maintained unless the plaintiff has exhausted her probate remedies. They acknowledge that they failed to raise this issue before the trial court or in the prior appeal from its order dismissing plaintiff's complaint, but maintain that we may consider the issue and correct our "error" in reversing dismissal of the complaint for failure to state a cause of action in *Nemeth v. Banhalmi* (1981), 99 Ill. App. 3d 493, 425 N.E.2d 1187. They assert that they may raise the issue of plaintiff's failure to state

a cause of action "at any time by any means." *People ex rel. Difanis v. Futia* (1978), 56 Ill. App. 3d 920, 925, 373 N.E.2d 530, 535.

■ We agree that under certain unusual circumstances, where a complaint entirely fails to state a proper cause of action and that defect is not curable, it may be raised for the first time on appeal. (See, *e.g., People ex rel. Difanis v. Futia* (1978), 56 Ill. App. 3d 920, 373 N.E.2d 530.) However, defendants' argument, although couched in terms of failure to state a cause of action in an attempt to fall within the holding of *Difanis,* is that plaintiff's claim should have been presented first through probate proceedings. It is our view that this is a matter which should have been presented by a proper motion to the trial court, to enable it to transfer the action to the proper division, and the failure to do so constitutes waiver of the issue.

■ Defendants further suggest that this is a question of the trial court's subject matter jurisdiction, arguing that probate courts in Illinois are vested with exclusive jurisdiction to hear and determine probate matters. Therefore, they posit, "exhaustion of probate remedies is not simply a matter of preference or judicial convenience; it is a matter of subject matter jurisdiction." While it is true that at one time probate courts had original and exclusive jurisdiction of probate matters (*In re Estate of Willavize* (1960), 21 Ill. 2d 40, 171 N.E.2d 21), we would remind defendants that those courts were abolished years ago, and that the circuit courts of each county now have original and unlimited jurisdiction (Ill. Const. 1970, art. VI, sec. 9). As a result, "the failure of the parties or the court, in a 'justiciable matter,' to comply with the provisions of a statute or a rule, may give rise to questions concerning procedure but not to questions concerning jurisdiction." (*In re Estate of Marcucci* (1971), 5 Ill. App. 3d 484, 493, 285 N.E.2d 141, 147, *rev'd on other grounds* (1973), 54 Ill. 2d 266, 296 N.E.2d 849; see also *Watt v. Farmers State Bank & Trust Co.* (1979), 71 Ill. App. 3d 455, 389 N.E.2d 947.) Furthermore, although the circuit court of Cook County is comprised of several divisions, including a probate division, those divisions are for the administrative convenience of the court and are not jurisdictional in nature. (*Haas v. Pick Galleries, Inc.* (1973), 12 Ill. App. 3d 865, 299 N.E.2d 93.) Since the question is one of procedure rather than jurisdiction, we believe that the issue was waived when defendants failed to raise it in the trial court.

Moreover, we have considered the numerous cases cited by defendants, and it is our view that they do not support their argument. In some of those cases, the action involved not malicious interference with an expectancy, but wrongful destruction of a will. In

each, the tortious conduct alleged was the destruction, concealment, or other suppression of a valid will after the decedent's death and, under those circumstances, courts have held that since probate statutes or case law permitted probate of a lost will, that procedure should have been followed (*Benedict v. Smith* (1977), 34 Conn. Supp. 63, 376 A.2d 774; *Allen v. Lovell's Administratrix* (1946), 303 Ky. 238, 197 S.W.2d 424) unless it appeared that the defendant, by his action, had rendered impossible proof thereof in a probate proceeding (see *e.g., Creek v. Laski* (1929), 248 Mich. 425, 227 N.W. 817). In some of those cases, the reasoning was predicated on the fact that original jurisdiction to determine what was the last will of a decedent was vested in a separate probate court, and other courts had no jurisdiction to determine the validity of a will. Others noted that, regardless of the impropriety of the defendant's actions, no damages were sustained if the lost will was in fact admitted to probate. (See *Benedict v. Smith* (1977), 34 Conn. Supp. 63, 376 A.2d 774.) In the instant case, plaintiff does not predicate her complaint on an allegation that the 1976 will is a "lost" will; she admits that it was revoked by the 1977 will, and we fail to see what would have been accomplished by an assertion in a probate proceeding that the original of the 1976 will was in existence and unrevoked at the time of Paul's death, particularly since defendants acknowledge that, had such an assertion been made, they would have submitted the 1977 will as proof of revocation.

In a second line of cases cited by defendants, the plaintiff's actions for malicious interference with an expectancy necessarily involved establishing the invalidity of a previously probated will, either by showing that a subsequent will existed which revoked the will admitted to probate (see, *e.g., McGregor v. McGregor* (D. Colo. 1951), 101 F. Supp. 848) or that the will which was submitted to probate was procured by undue influence (see, *e.g., Brignati v. Medenwald* (1944), 315 Mass. 636, 53 N.E.2d 673; *Johnson v. Stevenson* (1967), 269 N.C. 200, 152 S.E.2d 214). Under those circumstances, courts have held that the subsequent action for malicious interference with an expectancy constituted an impermissible collateral attack on the order admitting the will to probate, since the claim could have been asserted as part of the proceedings to admit the allegedly invalid will to probate (*McGregor*) or in a will contest (*Brignati; Johnson*). The recent decision in *Robinson v. First State Bank* (1983), 97 Ill. 2d 174, 454 N.E.2d 288, is illustrative of this rule. There, the plaintiffs brought an action for malicious interference with an expectancy which was premised on an allegation that a will which had been admitted to probate was procured by the undue influence of a beneficiary thereunder. It

appeared that the plaintiffs in *Robinson*, during proceedings to probate that will, had entered into a settlement agreement in which they agreed not to institute a will contest, and no such action was brought during the six-month period provided by section 8—1 of the Probate Act of 1975 (Ill. Rev. Stat. 1979, ch. 110½, par. 8—1). In affirming dismissal of the action, the supreme court noted that "underlying the plaintiffs' whole complaint is the necessary determination that the decedent's *** will *** that [was] admitted to probate and became valid under the Probate Act of 1975 [is] invalid" (*Robinson v. First State Bank* (1983), 97 Ill. 2d 174, 182, 454 N.E.2d 288, 292), and held that under those circumstances, the action was an impermissible collateral attack on the probate proceedings and could not take the place of a will contest.

Defendants admit that the facts of this case are somewhat different, in that no will was submitted to probate and, in the absence of a petition to probate a will, plaintiff did not have available to her the remedy of a will contest. Nevertheless, they urge that the above cases are authority for the proposition that plaintiff should have attempted to probate the 1976 will, thus provoking them to present proof that it was revoked, at which point plaintiff would have been able to contest denial of admission of the 1976 will to probate pursuant to section 8—2 of the Probate Act of 1975 (Ill. Rev. Stat. 1981, ch. 110½, par. 8—2); in effect, arguing that plaintiff had a duty to take steps to make the remedy available in a situation where it was otherwise unavailable rather than proceeding with her action for malicious interference. They acknowledge that the burden of proof would be the same in either action; *i.e.*, that plaintiff would have to prove that revocation of the 1976 will was procured through the exercise of undue influence, but maintain that pursuing the action through probate proceedings was preferable.

We believe that, contrary to defendants' assertions, there is a great deal of difference between holding that where a will has been submitted for probate, a plaintiff must avail herself of the statutory remedy of a will contest, and holding that where no will has been submitted, plaintiff must provoke a situation which would make the statutory remedy available rather than pursue her tort remedy. Defendants do not cite, nor has our own research discovered, any case so holding, although one case cited by defendants appears to make that statement. In *DeWitt v. Duce* (Fla. 1981), 408 So. 2d 216, the plaintiffs brought an action for malicious interference predicated on an allegation that they had an expectancy under a will, and the defendants therein, by means of undue influence, induced the testator to execute

a new will substantially less favorable to them. The second will had been admitted to probate, and no will contest was instituted. A lower court had ruled that a Florida statute prevented the plaintiffs from relitigating the issue of undue influence. That statute provided that "[i]n any collateral action or proceeding relating to devised property, the probate of a will in Florida shall be conclusive of its due execution; that it was executed by a competent testator, free of fraud, duress, mistake, and undue influence ***." (408 So. 2d 216, 218, citing Fla. Stat. sec. 733.103(2) (1977).) In effect, Florida had established by statute the rule which *Robinson* established by judicial decision—when a will is submitted for probate, an opponent thereof must avail himself of the statutory remedy of a will contest, and may not collaterally attack an order admitting that will to probate.

Nevertheless, the *DeWitt* court went on to make the broad general statement that "[t]he rule is that if adequate relief is available in a probate proceeding, then that remedy must be exhausted before a tortious interference claim may be pursued" (408 So. 2d 216, 218), and suggested that what the plaintiffs might have done was offer the prior will for probate while attacking the later will on grounds of undue influence and lack of testamentary capacity (408 So. 2d 216, 220). It is apparent that defendants have drawn their argument entirely from *DeWitt*; however, we are reluctant to follow *DeWitt's* lead. We have considered the same cases cited by that court and note that, not only does *DeWitt* fail to distinguish actions for malicious interference and actions for destruction of a will, but like defendants here, it ignores the sole basis for the courts' rulings in each of the malicious interference cases—that an order admitting a will to probate may not be collaterally attacked. The holding in *DeWitt* is consonant with those cases; moreover, the court's suggestion of the steps which the plaintiffs therein might have taken to avoid the bar are *dicta*, and we fail to see why the court suggested that they should have admitted the prior will to probate while simultaneously contesting the later will. If their will contest was successful, and the later will declared invalid, they could thereafter present the earlier will as the testator's last, valid testamentary act. The important point in *DeWitt* was that the plaintiffs could not let the later will be probated without contest, not how they might have gone about proving their claim.

■ Defendants nevertheless assert that this action is in fact a collateral attack on the probate proceedings. The only proceedings to which they can have reference is their petition for letters of administration, since that is the only proceeding that was completed. In effect, then, they argue that those proceedings are *res judicata* on the

question of the validity of the 1976 will, and plaintiff is estopped from proving that she had an expectancy thereunder because the probate court necessarily found that Paul died intestate. Once again, we note that this is an affirmative matter which should have been raised long ago in the trial court within the time for pleading by a motion pursuant to section 2—619 of the Code of Civil Procedure. (Ill. Rev. Stat. 1981, ch. 110, par. 2—619.) It is not an issue that may be raised for the first time during a second appeal, after several years of litigation, extensive discovery, a 13-day trial, and a prior appeal. Additionally, it appears that plaintiff did attempt to present her claim in conjunction with the petition for letters of administration, but the court dismissed her complaint, ruling that it could not be brought as a supplemental proceeding. Since that dismissal was without prejudice, the order was not appealable and plaintiff's recourse was to refile her complaint as a separate proceeding.

Defendants next contend that plaintiff has failed to prove an essential element of her cause of action, and the trial court's judgment must be reversed. It is their position that plaintiff has not proved the existence of an expectancy, maintaining that, in the absence of an express finding that the 1977 will and its subsequent revocation were invalid, the trial court could not properly have found that plaintiff had an expectancy under the 1976 will.

It is apparently defendant's argument that if the trial court did not discuss in its memorandum opinion whether Paul was acting under duress or undue influence in executing the 1977 will, then it must have failed to consider that issue. We disagree. That finding is implicit in the court's findings that plaintiff had an expectancy under the 1976 will and that the devise therein would have been received but for defendants' tortious interference. Moreover, the trial court need not make any findings of fact, and the failure to make a specific finding is not grounds for reversal (*Inter-Insurance Exchange v. Travelers Indemnity Co.* (1965), 57 Ill. App. 2d 17, 206 N.E.2d 518); rather, in reviewing a judgment, we will assume that all issues and controverted facts were found in favor of the prevailing party (*National Acceptance Co. of America v. Pintura Corp.* (1981), 94 Ill. App. 3d 703, 418 N.E.2d 1114), and the question before us is not whether the trial court made a specific finding, but whether its final determination is supported by the evidence (see *National Boulevard Bank v. City of Chicago* (1970), 123 Ill. App. 2d 166, 259 N.E.2d 862).

Defendants do not dispute that an expectancy existed at the time Paul executed the 1976 will; it was identical to an earlier will which also evidenced an intent to divide his estate equally between Vera and

Kornelia, and both women had long understood that this was his intention. The question here, then, is whether the trial court's implicit finding that Paul's revocation of the 1976 will was the result of fraud, duress, or undue influence is supported by the evidence.

A *prima facie* case of undue influence is established, and a presumption thereof arises, when a will contestant shows:

"(1) a fiduciary relationship between testator and a person who receives a substantial benefit under the will (compared to other persons who have an equal claim to testator's bounty);

(2) a testator in a dependent situation in which the substantial beneficiaries are in dominant roles;

(3) a testator who reposed trust and confidence in such beneficiaries; and

(4) a will prepared or procured and executed in circumstances wherein such beneficiaries were instrumental or participated." (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 436-37, 369 N.E.2d 1320, 1327.)

Once these elements are shown, the burden is on the proponent of the will to present evidence tending to rebut the presumption (*Tidholm v. Tidholm* (1945), 391 Ill. 19, 62 N.E.2d 473); however, "[t]he amount of evidence that is required from an adversary to meet the presumption is not determined by any fixed rule. A party may simply have to respond with some evidence or may have to respond with substantial evidence. If a strong presumption arises, the weight of the evidence brought in to rebut it must be great." (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 463, 448 N.E.2d 872, 877.) Thus, courts have required clear and convincing evidence to rebut the presumption where a fiduciary relationship exists as a matter of law, as between attorney and client (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 448 N.E.2d 872), and a greater quantum of evidence has generally been required where it is shown that the testator was enfeebled by age or disease (*Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 234 N.E.2d 91). Moreover, in determining whether the presumption has been rebutted, the trial court may consider the credibility of the witnesses offering the evidence (see *Schmidt v. Schwear* (1981), 98 Ill. App. 3d 336, 424 N.E.2d 410), and even where sufficient evidence has been presented to rebut the presumption, the opposing party is not then entitled to judgment as a matter of law. The burden remains on the contestant to prove the existence of undue influence, but at that point "the judge as the trier of fact must *** weigh the evidence and consider any and all reasonable inferences that can be drawn from those facts, including the possible

inference of undue influence." *Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 466, 448 N.E.2d 872, 878.

■ This standard, then, requires a three-tiered inquiry on review: (1) whether plaintiff established a *prima facie* case of undue influence; (2) if the *prima facie* case was established, whether defendants introduced evidence sufficient to rebut the resultant presumption; and (3) if the rebuttal evidence was sufficient, whether the trial court's determination that the 1977 will was the product of undue influence is contrary to the manifest weight of the evidence.

■ With regard to the first step in our analysis, we believe that plaintiff did establish a *prima facie* case of undue influence sufficient to raise a presumption thereof. There is evidence that, although never formally adopted, she enjoyed a warm familial relationship with Paul and had been treated as his daughter until he took up residence with defendants; that defendants substantially benefited by the 1977 will in comparison to her; that at the time of revocation, Paul was 86 years old and suffering from moderately severe emphysema and senile dementia; that Paul depended on defendants for his physical care, transportation, and transaction of his financial affairs; that he reposed considerable trust and confidence in then, turning over all of his assets to them as well as management of his financial affairs; that defendants limited plaintiff's access to Paul and told him that she was of low moral character, mentally ill, and treated him badly, while giving him the impression that they were assuming a considerable financial burden in providing for his care; and that defendants contacted the lawyer who drafted the 1977 will, were present at each stage of its preparation and execution, and participated in the discussion of its provisions.

■ The next question, then, is whether defendants presented sufficient evidence to rebut the presumption. As we noted, the quantum of evidence necessary in rebuttal depends on the circumstances of each case. Here, since no fiduciary relationship existed as a matter of law, the only circumstance which might increase the quantum of evidence necessary is proof that Paul was enfeebled by age or disease in January 1977, when the 1977 will was executed, rendering him unusually susceptible to. the exercise of undue influence. It appears from the testimony that Paul was 86 and suffering from emphysema and, in all probability, at least the early stages of senile dementia. This last finding is vehemently denied by defendants; however, we do not believe that it is particularly relevant at this juncture, because despite these ailments, plaintiff's own testimony established that Paul was mentally alert just six months before executing the will, and the only testimony

from which we could infer that he showed signs of serious impairment was that he was confused, irritable, and acting in an irrational and disruptive manner five months after executing the will. For this reason, we believe that the presumption here was not particularly strong, and could have been overcome by the presentation of some contrary evidence. Leaving aside for the present questions of the credibility of the witnesses and the conflicting evidence, it is our view that defendants did present sufficient contrary evidence through testimony tending to show that Paul disliked plaintiff and had always treated Kornelia more favorably; that while he did repose considerable trust and confidence in defendants, he was not dependent upon them, but freely chose to reside with them and retained control over his financial affairs; and that his decision to alter his will was the product of a free choice based on his antipathy toward plaintiff and his warm relationship with defendants.

We therefore reach the third level of our analysis, *i.e.*, whether the trial court's judgment is contrary to the manifest weight of the evidence. In considering this issue, we must bear in mind that it is the province of the trial court, when sitting without a jury, to resolve disputed questions of fact and to determine the credibility of witnesses and the weight to be given their testimony (*MBL (USA) Corp. v. Diekman* (1983), 112 Ill. App. 3d 229, 445 N.E.2d 418), and we will not substitute our judgment thereon unless the opposite conclusion is clearly evident (*Balla v. Department of Revenue* (1981), 96 Ill. App. 3d 293, 421 N.E.2d 236). Thus, it is not sufficient to show that the record would support a contrary decision (*Graham v. Mimms* (1982), 111 Ill. App. 3d 751, 444 N.E.2d 549); we will affirm if there is evidence to support the trial court's judgment (*Swartzberg v. Dresner* (1982), 107 Ill. App. 3d 318, 437 N.E.2d 860).

■ Defendants maintain that three findings relevant to this issue are contrary to the manifest weight of the evidence. First, they assert that plaintiff's relationship with Paul was such that she was not a natural object of his bounty. In effect, they argue that this poor relationship, rather than any undue influence on their part, explains his decision to alter his will in their favor. Second, they contend that Paul was not dependent on them, thus negating the finding that a fiduciary relationship existed. Finally, they maintain that the evidence entirely fails to show that they procured or in any way participated in the drafting and execution of the 1977 will.

With regard to plaintiff's relationship to Paul, the trial court found, based on her testimony, that a loving father-daughter relationship existed. This finding is supported by the fact that in the 1975

and 1976 wills, Paul referred to her as his daughter and accorded her equal treatment therein with his natural daughter, and even in the 1977 will reiterated his affection for her. His equal regard for the two women was reaffirmed in June 1976, just six months before executing the 1977 will, when he offered plaintiff $15,000 after having given that amount to defendants, and gave each woman an equal share of their mother's jewelry which he had inherited upon her death.

Defendants and their daughter, on the other hand, asserted that Paul disliked plaintiff to the degree that he would not answer her letters or talk to her on the telephone, avoided her when she visited, and did not even want her present at his funeral. However, the trial court found that their testimony on this issue was not credible, and we will not substitute our judgment thereon. Nevertheless, they maintain that there was ample "objective" proof of a strained relationship, as evidenced by the fact that Rose had to "make" Paul sign the 1975 will in order to protect plaintiff, and that plaintiff "compelled" him to execute the 1976 will and to give her the jewelry. This interpretation of the facts is possible if we accept defendants' testimony regarding the relationship between plaintiff and Paul; however, if we accept plaintiff's testimony, then the inference arises that these acts were the result of Paul's fatherly affection for both women. It is settled that " '[w]here *** several reasonable inferences are possible from conflicting testimony, we are obligated to accept those which support the trial court's order.' " (*Kelley v. First State Bank* (1980), 81 Ill. App. 3d 402, 408, 401 N.E.2d 247, 252); therefore, we cannot say that the trial court's finding on this issue is contrary to the manifest weight of the evidence.

Turning to the relationship between defendants and Paul, we note that a fiduciary relationship may exist as a matter of law, "or it may be moral, social, domestic or even personal in its origin." (*Wiik v. Hagen* (1951), 410 Ill. 158, 163, 101 N.E.2d 585, 587.) In determining whether such a relationship existed, courts have looked to whether the testator was dependent upon the devisee for care of his physical needs (*Mitchell v. Van Scoyk* (1953), 1 Ill. 2d 160, 115 N.E.2d 226) or transacting his personal and financial affairs (*Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 234 N.E.2d 91). In the instant case, the testimony indicates that Paul was dependent upon others for his care. At his wife's death, defendants suggested several options to him, but each involved dependency upon another for his physical care—he could move in with them, or he could reside elsewhere and hire a housekeeper. Kornelia acknowledged that while living with them, Paul was in fact dependent upon her for his physical needs, and Paul

seems to have acknowledged this dependency when he expressed to plaintiff his fear that if he did not provide defendants with the down payment on a house, he would be placed in a nursing home. Apparently no one, including Paul, perceived that he was able to care for himself without assistance. Further testimony established that wherever he went, whether to medical or legal appointments, to social events, or to transact business, a member of the Banhalmi family accompanied him and remained with him. All of the financial records introduced indicated that Paul had placed economic matters in defendants' hands. He turned his entire income over to them and, since he was not a signatory on their checking account, must have depended on them to pay his bills; he gave them free access to his savings account and his safe deposit box, and it appears that they frequently availed themselves of that access; and defendants readily acknowledge that George, at Paul's request, helped him with his financial affairs.

Defendants argue that Paul freely placed himself in their care, and posit that, under those circumstances, no dependent relationship existed because he could have chosen to depend on others. We disagree. This contention does not negate the existence of a fiduciary relationship; that he chose to depend entirely on defendants is a measure of the absolute trust and confidence that he reposed in them; it does not make him any the less the dependent party in the relationship. The central issue is not whether he chose to depend on defendants rather than on others, but whether defendants used this choice to their advantage.

The final question we must address with regard to this issue is the circumstances surrounding execution of the 1977 will. It appears from the testimony that defendants made the initial contact with the attorney for Paul, were present when the will was discussed and when it was executed, and participated in the discussions. Defendants, however, point to the testimony of the attorney and witnesses as proof that Paul was mentally competent and acting of his own free will. The testimony with regard to his mental competency, of course, goes to testamentary capacity, which is not in issue here. Moreover, the only witness who testified stated that he could not relate the substance of the conversations between Paul, defendants, and the attorney who drafted the will, because they were conducted in Hungarian—a language he did not understand. The evidence, then, turns on the testimony of the drafting attorney, and we find his statements of little assistance on this issue. He never spoke to Paul outside defendants' presence, and although he was cognizant of the drastic alteration in an elderly client's dispositive scheme over a period of just six

months and that the changes made favored a beneficiary who was present to the detriment of a beneficiary who was absent, he stated that he did not question Paul on this point because he "didn't want to get too involved."

We must turn, then, to the circumstances which occurred between June 1976, when it was clearly Paul's will that the two women he referred to as his daughters be treated equally, and January 1977, when that intention apparently changed. During that period, Paul was living with defendants and dependent upon them. Kornelia acknowledged making statements to him that plaintiff was of low moral character and a liar, and that she was mentally ill, asserting that the latter statement was to "excuse" plaintiff's conduct toward Paul "as illness, not meanness," apparently suggesting to Paul that he was receiving poor treatment from plaintiff. In contrast to this, defendants stated that Paul knew that if he came to live with them they would have to have a larger residence; that he knew the burden of this larger home was beyond their means; and that he agreed to pay them, first $1,000 per month, then his entire income in return for the burden they had assumed in caring for him. Also during this period, Paul was hospitalized for a time with pneumonia and moderately severe emphysema, and spent a short time in a nursing home thereafter as part of his recuperation. It could reasonably be inferred from this testimony that Paul came to believe, through defendants' discussions with him, that plaintiff was immoral and mentally ill and treated him badly, while defendants were caring for him and making financial sacrifices on his behalf. His illness might reasonably have reinforced in his mind his dependency on defendants, as well as his desire to remain with them rather than be placed in a nursing home.

Defendants assert that all of the testimony indicates that they treated Paul with love and kindness, and that because of their care, it was natural that he would want to benefit them more than plaintiff, and that this intention was evidenced in the 1977 will. However, the question here is undue influence, not duress; on that issue, it need not be shown that the testator was abused or coerced. A number of courts have noted that the question is the degree of influence acquired, not the manner in which it was acquired. In *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 105, 234 N.E.2d 91, 99, the court stated:

> "The normal influence gained or acquired by affection or kindness is not undue influence under the law. If, however, the degree of influence so-acquired is such as to deprive the testator of her own free will and agency, then it does become undue

influence. In the absence of fraud or similar conduct, whether the influence is wrongful or undue depends not on the manner of influence, but on the degree of influence. Thus, even though influence is not acquired in any untoward manner, if it deprives the testator of his free agency, it is wrongful and undue."

Similarly, in *Kelley v. First State Bank* (1980), 81 Ill. App. 3d 402, 414, 401 N.E.2d 247, 256, the court noted:

"If kindness and affection result in overcoming the testator's free agency and leave the will that of the beneficiary rather than the testator, then such constitute undue influence." (81 Ill. App. 3d 402, 414, 401 N.E.2d 247, 256.)

Thus, undue influence, whatever its origin, is " 'any improper *** urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.' [Citation.]" (*Franciscan Sisters Health Care Corp. v. Dean* (1983), 95 Ill. 2d 452, 460, 448 N.E.2d 872, 875.) In the instant case, Paul was already living with defendants and being cared for by them in June of 1976 when he made the will dividing his estate equally. The only change which occurred in the next six months was that he began paying defendants and eventually turned over to them all of his income in return for this care when they made it known that they could not cope with the financial burden his presence placed upon them. His statement to plaintiff indicates that he wanted to insure that he would be able to remain with them rather than being placed in a nursing home, and that he believed one way of insuring his continued care was to benefit defendants financially. Finally, as noted above, defendants also spoke ill of plaintiff, apparently fostering resentment of her "greed" in wanting to be treated equally when they were the ones providing care and companionship. However, it appears that they, rather than Paul, initially felt that they should be benefited more than plaintiff because of his care. Paul showed no such inclination in 1976, when he was already living with defendants and paying them nothing. We believe that the trial court could reasonably infer from these circumstances that the 1977 will was reflective of defendants' will, rather than Paul's, and that the execution thereof was the product of undue influence.

Defendants next contend that various findings of fact are contrary to the manifest weight of the evidence. The major elements of their arguments have already been addressed in our consideration of the last issue. Because defendants alleged that the trial court merely adopted findings suggested by plaintiff, rather than reaching its own conclusions, we have carefully reviewed the testimony and exhibits on

the remaining points raised and find that defendants' arguments thereon depend either on the credibility of the witnesses, the weight to be given their testimony, or the reasonable inferences to be drawn from conflicting testimony, all of which are for the trial court, not the reviewing court, to determine. At most, defendants have shown that the evidence could support a contrary judgment; however, because we have found evidence to support each of the contested findings, a detailed discussion here would serve no useful purpose, and it is our view that the trial court's findings are not contrary to the manifest weight of the evidence.

Defendants have also suggested that the trial court was so biased against them that "he has abandoned his duty to be fair and impartial in his consideration of the evidence," and we should therefore give little weight to the findings. We have searched the record for any indication of bias, and have found instead that the trial court conducted this 13-day trial with fairness, impartiality, and considerable patience. In its extensive memorandum opinion, the trial court did express its views on the credibility of the witnesses, but we believe that this was offered in explanation of its findings and was not reflective of any impartiality or bias in reaching those conclusions. Furthermore, what defendants particularly object to are the trial court's findings with regard to their motivation. In our view, such findings are irrelevant in any event, since, in proving the elements of her action, plaintiff need show only tortious conduct on defendants' part, not their motivation in engaging in that conduct.

Finally, defendants contend that the amount of compensatory damages awarded is contrary to the manifest weight of the evidence. The trial court's memorandum opinion does not state the basis for its award of $300,000; however, as with any factual finding, we may affirm if the amount is supported by the evidence. (*Farwell Construction Co. v. Ticktin* (1980), 84 Ill. App. 3d 791, 405 N.E.2d 1051.) Of course, damages may not be predicated on speculation or conjecture (*Posner v. Davis* (1979), 76 Ill. App. 3d 638, 395 N.E.2d 133), but a plaintiff need not prove an exact amount of loss (*Gannon v. Freeman* (1982), 103 Ill. App. 3d 917, 431 N.E.2d 1303). It is sufficient if damages are proved to a reasonable degree of certainty (*Sheetz v. Morgan* (1981), 98 Ill. App. 3d 794, 424 N.E.2d 867); that is, the evidence must tend to establish a basis for the assessment with a fair degree of probability (*La Grange Metal Products v. Pettibone Mulliken Corp.* (1982), 106 Ill. App. 3d 1046, 436 N.E.2d 645; *Farwell Construction Co. v. Ticktin*).

Under the expectancy found to exist, plaintiff would have received

one-half of Paul's estate upon his death. Because the trial court made no specific findings of fact in reaching its determination that the estate had a value of $600,000, we have carefully reviewed the extensive testimony presented on this issue, assuming throughout that all disputed questions of fact were resolved in plaintiff's favor, and believe that the record would support the following findings:

(1) *Real Estate*. The Del Argo Apartments, which sold for $380,000, and the Granby Street property, which sold for $100,000, as well as a one-third interest in the Northbrook home, which had an appraised value of $90,000, were clearly owned by Paul at the time of his death. Testimony established that defendants received $250,000 on the sale of the Del Argo Apartments, but $100,000 of the $130,000 difference went to repay a loan that they procured after Paul's death, using the property as security, while the remaining $30,000 went to pay the costs of selling the property. The trial court could have found that the value of this property was $250,000. Defendants' income tax return indicated that they received $47,000 from the sale of the Granby Street property. These prices reflect a higher value than the appraised value contained in the 1979 estate tax return, but we believe that the trial court could have found that the actual selling price was a more accurate reflection of the property's value. The 1979 estate tax return values the interest in the Northbrook home at $30,000. The evidence, then, would support a finding that Paul's estate included real estate with a value of $327,000.

(2) *Stocks*. The trial court found that a number of stock certificates purportedly transferred to defendants by *inter vivos* conveyance were forged. Defendants dispute this finding, but as noted above, their argument is based on the credibility of the witnesses and the reasonable inferences to be drawn from the circumstances. Therefore, the evidence supports a finding that they should be included in the estate. Plaintiff suggested at trial that this stock be valued at its selling price of $19,350, and that figure is supported by the evidence.

(3) *Jewelry*. The trial court could have found that Paul retained $9,000 worth of jewelry in 1976 when he gave each of the women a share; and that jewelry with an appraised value of $57,050 was contained in defendants' safe deposit boxes after Paul's death (the 1983 appraisal), and the jewelry included therein and not otherwise accounted for was properly included in Paul's estate. However, a comparison of the 1976 appraisal on which Paul's $9,000 share is based and plaintiff's testimony regarding what Paul and Kornelia received in the 1976 distribution reveals that three of the pieces included in the 1983 appraisal were items given to Kornelia in 1976, and they

therefore would not have been part of Paul's estate. Similarly, several of the items included in the $9,000 share of jewelry retained by Paul also appeared in the 1983 appraisal; they must be eliminated from one of the lists to avoid double recovery. There is no evidence of their value at the time of Paul's death in 1978, and since the trial court could have found that the higher 1983 appraisal more accurately reflected their value, we will exclude the duplicate items from the 1976 appraisal. Therefore, it is our view that the trial court could have reasonably found that Paul's estate contained jewelry worth $31,400, based on the following calculations:

| | |
|---|---:|
| 1983 appraisal | $57,050 |
| 1976 appraised value of Paul's share | 9,000 |
| | $66,050 |
| Less 1976 items included in 1983 appraisal | (3,400) |
| Less items included in 1983 appraisal which were given to Kornelia in 1976 | (31,250) |
| Total jewelry: | $31,400 |

(4) *Income.* Paul's estate generated $19,323.45 in income after his death, which clearly should be included in his estate. During the period of his residency with defendants, his income was pooled with theirs and thereafter expended by them. The trial court could have found that Paul's action in pooling his income with that of defendants was the product of duress or undue influence, and therefore could have included some portion of the $67,370 he received in income from 1976 through 1978 as part of his estate. Of course, this income could have been offset by proof of reasonable expenses incurred during his lifetime; however, defendants, who are the only parties having access to that information, testified that those funds were commingled with their own, and that no accounting was possible because they failed to keep records. Thus, plaintiff was unable to show Paul's expenses for the relevant period, and defendants made no attempt to present evidence which would have supported a setoff of expenses against this element of damages. Nevertheless, we believe that one expense can be ascertained from the record. If we are to include in Paul's estate a one-third interest in the Northbrook home, it is only equitable that the reasonable expenses of acquiring that interest be set off against his income. The evidence discloses that a down payment of $15,000 was made in 1976, and thereafter monthly mortgage payments totaling $17,920 were made during Paul's lifetime (payments of $564 per month from April 1976 through November 1978). Since Paul had a one-third interest in the house, one-third of the expenses should be

charged against his income. Therefore, we believe that the evidence would support a finding that Paul's estate included income of $55,410 earned during his lifetime, based on the following calculations:

| | |
|---|---:|
| Income from 1976 through 1978: | $66,050 |
| Less one-third of the $15,000 down payment: | (5,000) |
| Less one-third of the $16,920 mortgage payments: | (5,640) |
| Total income: | $55,410 |

Plaintiff suggests that there was evidence to support inclusion of several other items in Paul's estate. First, she asserts that George's coin collection should be included, apparently on the theory that the coins were purchased from the pooled funds, and the 11 gold coins therein were Paul's property. We disagree. Even if the coins were purchased with joint funds, Paul's share of the funds are included in the income found to be a part of his estate, and plaintiff may not recover twice for the same item. Furthermore, it appears from plaintiff's own testimony that Kornelia received nine gold coins as part of her share in the 1976 distribution of Rose's jewelry, and it was Susan Banhalmi's uncontroverted testimony that several of the gold coins were gifts to her from Rose; this adequately accounts for the gold coins included in George's collection. Plaintiff also asserted that Rose and Paul had a number of other gold coins, although she did not state that she ever saw them, or even estimate how many they might have owned. Instead, she asked the trial court to speculate that some unspecified number of coins existed, that they had once been kept in the five safe deposit boxes that defendants rented, and that defendants had concealed them somewhere prior to trial. This rank conjecture falls far short of the reasonable degree of certainty required to sustain a finding of damages.

Plaintiff also maintains that the trial court could have found that defendants converted items of jewelry other than those contained in the safe deposit boxes. She testified that her mother owned four unaccounted-for items, and an expert appraiser estimated their value at $25,500 to $121,000, based on pictures of purportedly similar pieces. However, plaintiff also stated that she last saw these items in her mother's possession in 1972 or 1973; there was simply no evidence to indicate what happened to them between 1973 and Rose's death, or that, as plaintiff conjectured, defendants had them hidden at some unknown location. As with the gold coins, this speculative testimony does not provide the fair degree of probability which case law requires as the basis for an award of damages.

Therefore, we believe that the highest value which the trial court could have placed on Paul's gross estate from the evidence presented was $452,484, based on the following calculations:

| | |
|---|---|
| Real estate: | $327,000 |
| Stock: | 19,350 |
| Jewelry: | 31,400 |
| Estate income: | 19,324 |
| Income during lifetime: | 55,410 |
| Gross estate: | $452,484 |

However, we cannot say that plaintiff was damaged in the amount of one-half of the gross estate, since it is clear from the 1979 estate tax return that various expenses and taxes were paid out of the estate prior to distribution. Had plaintiff received half of Paul's estate as a beneficiary, half of the expenses would have been allocable to her.

The 1979 estate tax return shows the following deductions from Paul's estate:

| | |
|---|---|
| Funeral expenses: | $ 1,679 |
| Probate costs: | 1,251 |
| Tentative tax liability: | 81,992 |
| Total deductions: | $84,922 |

We believe that the estimated tax figure is low, since the return values Paul's Norfolk property at a price substantially below its eventual selling price, upon which we calculated the gross estate, and does not include any of the items of jewelry and income which the trial court could have found were properly included in the estate. Nevertheless, defendants presented no expert testimony on what the taxes would have been, and we will not speculate on that issue. We also note that the 1979 estate tax return includes a deduction from the estate of $40,000 in estimated attorney fees. However, this is merely an estimate, and there is no evidence of the actual attorney fees paid in connection with probating the estate, as opposed to defending litigation occasioned by defendants' tortious conduct; therefore, we do not believe that this figure should be included in calculating what distribution plaintiff would have received from Paul's estate.

It is our view, then, that while Paul's gross estate could properly have been valued at $452,484, plaintiff's damages should have been based on an estate of $367,572, taking into account the costs and taxes which would have been deducted prior to distribution. It appears that the trial court's finding with regard to compensatory damages that Paul's estate had a value of $600,000, entitling plaintiff to $300,000 in damages, is contrary to the manifest weight of the evi-

dence. Under these cicumstances, however, we need not remand this action to the trial court. Pursuant to our powers under Supreme Court Rule 366(a) (87 Ill. 2d R. 366(a)), we may modify the trial court's order to reflect a proper amount where we find that the damages awarded were excessive or unsupported by the facts of record (see, *e.g., North Shore Marine, Inc. v. Engel* (1980), 81 Ill. App. 3d 530, 401 N.E.2d 269; *Slater v. Jacobs* (1977), 56 Ill. App. 3d 636, 371 N.E.2d 1054). Accordingly, since it is our view that the highest value for Paul's estate which this record would support is $367,562, the trial court's order should be modified to reflect compensatory damages of one-half that amount—$183,781.

For the foregoing reasons, the trial court's order is modified to provide for compensatory damages of $183,781, and the judgment is affirmed as modified.[3]

Affirmed as modified. ·

LORENZ and WILSON, JJ., concur.

---

[3]It should be noted that no question was raised on appeal as to the propriety of the punitive damages awarded.